**Alicia MORALES et al.,
Plaintiffs-Appellees,**

v.

**James A. TURMAN, Individually and in his official capacity as Executive Director of the Texas Youth Council, et al., Defendants-Appellants.**

**No. 74–3436.**

United States Court of Appeals, Fifth Circuit.

July 21, 1976.

Rehearing and Rehearing En Banc Denied Sept. 17, 1976.

---

John L. Hill, Atty. Gen., Thomas W. Choate, Asst. Atty. Gen., Austin, Tex., Robert Salter, Gatesville, Tex., for defendants-appellants.

Andrew P. Miller, Atty. Gen., Robert E. Shepherd, Jr., Asst. Atty. Gen., Richmond, Va., for Com. of Va., amicus curiae.

Steven Bercu, El Paso, Tex., Peter B. Sandmann, Robert Walker, San Francisco, Cal., for plaintiffs-appellees.

Patricia M. Wald, Mental Health Law Project, Washington, D. C., for American Orthopsychiatric Ass'n, amicus curiae.

Roby Hadden, U. S. Atty., Tyler, Tex., William Malcom Logan, Jr., Neal Tonken, Attys., Frank M. Dunbaugh, Deputy Asst. Atty. Gen., Dept. of Justice, Civ. Rights Div., Washington, D. C., for the U. S., amicus curiae.

Before AINSWORTH, MORGAN and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

This action, predicated on the notion of a constitutionally based right to rehabilitative treatment in juvenile correctional facilities, involves a sustained attack on a wide range of practices, policies, procedures, and resultant conditions authorized by the Texas Youth Council (TYC), which has responsibility under Texas law for minors adjudicated delinquent and involuntarily committed to its custody by Texas courts.[1]  As counsel for plaintiffs-appellees stated at the commencement of his oral argument before us, "at the heart of this case is the question whether the juvenile justice system as we now know it will continue to exist."  Because the suit seeks to enjoin the operation and effectuation of state legislative and administrative policies in a manner which triggers the three-judge court requirement of 28 U.S.C. § 2281, we are without jurisdiction to consider the significant issues raised by this appeal, and remand the case for the convening of a three-judge court pursuant to 28 U.S.C. § 2284.

I. The Proceedings Below

■ This litigation commenced on February 12, 1971 with the filing of a class action on behalf of those involuntarily committed to the custody of the TYC against Dr. James A. Turman, then Executive Director of the TYC, members of the TYC, superintendents of TYC schools, and other employees responsible for supervision of juveniles committed to TYC custody.  Originally the scope of the suit was limited to securing private access to counsel,[2] but it rapidly expanded to embrace a wide range of issues regarding the nature and adequacy of TYC programs and procedures.[3]  In August of 1973, the District Court issued a preliminary injunction which proscribed the con-

1.  See Vernon's Tex.Civ.Stat.Ann., art. 5143d (establishing the TYC and specifying those subject to its custody); Vernon's Tex.Civ.Stat. Ann., art. 2338–1 (1971) (governing commitment of juvenile delinquents at time of trial). Article 2338–1 was repealed by the Texas Legislature in 1973, when it enacted Title 3 of the Texas Family Code, Vernon's Tex.Fam.Code § 51.01 et seq., which replaced Article 2338–1 as of September 1, 1973. "Delinquent conduct" is defined by section 51.03(a) of the Fam-

ily Code as not including so-called "status of fenses" such as truancy, in contrast to the prior definition under Article 2338–1, § 3.

2.  See Morales v. Turman, E.D.Tex., 1971, 326 F.Supp. 677.

3.  As the action developed into a "right to treatment" case, the District Court entered orders allowing plaintiffs wide access to TYC institutions for purposes of study and observation. Morales v. Turman, E.D.Tex., 1972, 59 F.R.D. 157.

tinuation of particularly egregious practices and activities that would "work irreparable injury, both physical and psychological, upon members of the plaintiff class."[4] The basis for this relief was the "cruel and unusual punishment" clause of the Eighth Amendment of the United States Constitution and the plaintiffs' alleged right to treatment under the Federal Constitution and state statutes. *Morales v. Turman*, E.D.Tex., 1973, 364 F.Supp. 166.[5] This interim order was followed a year later on August 30, 1974 with the 70-page order and opinion from which the present appeal was taken.[6] *Morales v. Turman*, E.D.Tex., 1974, 383 F.Supp. 53.

The fact that plaintiffs' action involves a comprehensive constitutional attack on the practices and policies of the TYC is apparent from the plaintiffs' specification of the legal issues raised by the case in the final pretrial order of June 14, 1973.[7] In their formulation of the issues in the pretrial order, plaintiffs questioned *inter alia* whether the "rules, regulations, practices and policies of the TYC" violated the rights of committed youths (1) to First Amendment freedoms of speech, expression, religious choice, and the right to petition for redress of grievances; (2) to freedom from unreasonable searches and seizures under the Fourth Amendment; (3) to protection from cruel and unusual punishment as guaranteed in the Eighth Amendment; (4) to privacy, as assured by the First, Fourth, Fifth and Ninth Amendments; (5) to freedom from involuntary servitude under the Thirteenth Amend-

4. *Morales v. Turman*, E.D.Tex., 1973, 364 F.Supp. 166, 175.

5. The "emergency interim relief" afforded in August of 1973 was extensive. The order entered at that time sharply restricted the use of corporal punishment and other physical force; desegregated dormitory facilities; tightened procedures for assigning inmates to dormitory units used for housing suspected homosexuals; established procedural controls and guidelines applicable to solitary and other forms of disciplinary confinement; set up grievance procedures; circumscribed the extent to which TYC personnel could inspect inmate mail; assured inmates the right to communicate in non-English languages; liberalized visitation rights; demanded that nursing care be available on a 24-hour basis; and required that individuals applying for positions involving regular contact with juveniles be screened through psychological testing and psychiatric interviews to assure fitness to work with minors. *Morales v. Turman*, E.D.Tex., 1973, 364 F.Supp. 166.

6. Appellees concede the finality and appealability of the lower court's determination that the constitutional rights of minors incarcerated by the TYC have been violated. They maintain, however, that the detailed "minimum standards" necessary for protection of those rights—particularly the right to treatment—are not final because the judge withheld issuance of permanent injunctive relief pending submission of a comprehensive plan to be drawn up by the parties. The difficulty with this contention is that while some flexibility was left to the parties in determining precisely how compliance with the minimum standards would be structured, the District Court made it perfectly clear that any plan submitted must be consistent with the minimum requirements laid out in its opinion. *See* 383 F.Supp. at 126. In circumstances such as these, the requirement of

finality must be given a practical construction. *See Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152–53, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964). . The fact that the lower court has instructed the parties to arrange the details of implementing its decision does not imply that the underlying determination of the minimum standards supposedly required by the right to treatment are not appealable. *Cf. Brown Shoe Co. v. United States*, 370 U.S. 294, 308–09, 82 S.Ct. 1502, 1514–15, 8 L.Ed.2d 510 (1962). The minimum standards established by the District Court are not, as we read them, mere guidelines subject to further negotiation by the parties. They constitute a final adjudication determining the minimal content that must be given to the "right to treatment" as it applies to virtually every aspect of TYC operations. In challenging the conclusion that TYC inmates have a "right to treatment" with the minimum contours delineated in the lower court's opinion, appellants thus attack a final decision from which they may properly appeal under 28 U.S.C. § 1291. In any event, the order requiring that the parties meet and negotiate a plan complying with the decision is itself a mandatory injunction which is appealable under 28 U.S.C. § 1292(a)(1). *See Board of Public Instruction of Duval County v. Braxton*, 5 Cir., 1964, 326 F.2d 616, 618–19, *cert. denied*, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216.

7. The pretrial order supersedes the pleadings and becomes the governing pattern of the lawsuit. *Pacific Indemnity Co. v. Broward County*, 5 Cir., 1972, 465 F.2d 99, 103; *Case v. Abrams*, 10 Cir., 1965, 352 F.2d 193, 195–96. It may thus be relied upon as an indicator of the nature of the relief sought for purposes of determining whether a three-judge court is required.

ment; (6) to equal protection of the laws vis-a-vis adults fined or imprisoned for the same offenses under the Fourteenth Amendment; (7) to rehabilitative treatment administered in a manner least restrictive of their liberty, assuming judicial determination that such a right exists under the due process clause of the Fourteenth Amendment; and (8) to freedom from discipline while institutionalized, arbitrary transfer between institutions or groupings, and parole revocations, without due process of law.

The breadth of the relief requested is apparent from the plaintiffs' second amended complaint. Among other things, the court was asked to order the defendants to submit and implement a plan whereby the plaintiff class would be assured: (1) that safe and sanitary conditions would be restored to and maintained at TYC schools and facilities; (2) that architectural and design changes would be made to facilitate rehabilitation; (3) that inmates would be accorded essential preventive and therapeutic medical, dental, and mental health services, including complete physical and mental examinations upon admission to TYC schools and periodically thereafter; (4) that classification and confinement schemes would be organized to prevent grouping multiple offenders with youths having less serious records; (5) that an individualized treatment plan would be developed as each individual enters TYC custody with the participation of psychiatrists, psychologists, counsellors and other professionals, and that the individual treatment plans thereafter would be implemented; (6) that adequate educational, vocational and work programs would be established; (7) that TYC staff would be recruited, selected, trained and employed so as to ensure that staff members in sufficient numbers and with adequate education and experience would be available; (8) that confinement in isolation cells would be eliminated, and that the practices and procedures governing disciplinary confinement of any kind would be ameliorated; (9) that visiting regulations and facilities would be established which would ensure decency, comfort, privacy, reasonable and frequent visiting periods,

and which would place no restrictions on the identity of visitors; (10) that adequate, unmonitored telephone access would be provided; (11) that corporal punishment would be prohibited; (12) that extensive procedural protections could be invoked by an inmate before any disciplinary measures could be taken against him; and (13) that inmates would be permitted to speak, write, and receive letters in languages other than English. The plaintiffs further requested that the defendants be restrained from engaging in any of the unlawful acts, practices or omissions itemized at length in connection with their "right to treatment" cause of action, and that if the defendants failed to submit and implement a satisfactory plan, further incarceration and detention of the plaintiff class in deficient TYC facilities should be enjoined.

The District Court granted virtually all the relief that was requested by the plaintiffs. *See generally Morales v. Turman*, E.D.Tex., 1974, 383 F.Supp. 53. The sheer comprehensiveness of the memorandum opinion that was issued makes it impossible to recount here the multitudinous requirements that the decision imposes on the TYC. A few examples will have to suffice. The District Court found that the Gatesville State School for Boys, the school with the largest capacity in the state, and Mountain View State School for Boys, the maximum security facility in the entire TYC system— the school to which troublesome elements in other state schools were sent—were "places where the delivery of effective rehabilitative treatment is impossible" due to the "history of brutality and repression" at those institutions. 383 F.Supp. at 121, 58– 59, 72, 76. The court held that these schools must be abandoned as soon as possible. *Id.* at 125. The court disparaged the TYC policy of utilizing large institutions located in small rural towns located far from urban population centers, because of the difficulties thus created for involving families in treatment plans and for attracting qualified professional staff. *Id.* at 123–24. The court further held that the defendants "must cease to institutionalize any juveniles except those who are found by a responsi-

ble, professional assessment to be unsuited for any less restrictive, alternative form of rehabilitative treatment," *id.* at 125, and that they must "create or discover a system of community-based treatment alternatives adequate to serve the needs of those juveniles for whom the institution is not appropriate." *Id.* In addition, "those *few* juveniles for whom close confinement is appropriate must be surrounded by a staff trained to meet their special needs, in a virtually one-to-one ratio." *Id.* at 125–26 (emphasis in original). Some indication of the composition of the trained staff thus mandated may be gleaned from the court's summary of the personnel requirements at a "minimally adequate institution" in the area of psychiatric care alone: there must be a psychiatrist certified by the American Board of Psychiatry and Neurology as qualified in the field of child psychiatry for each 100 students. *Id.* at 102, 105. His services must be supported by at least one psychologist with a doctorate, and two with master's degrees, as well as psychiatric nurses—also for each 100 students. *Id.* at 102. Additional personnel requirements stem from minimum standards in areas of medical treatment, social worker care, dietary requirements, educational and vocational programs, houseparents, and correctional officers.

Under the District Court's decision, each individual entering the TYC system

> must have the benefit of an individual assessment, to serve as the basis for his treatment plan. The plan should include, *inter alia,* a family history, a developmental history, a physical examination, psychological testing, a psychiatric interview, community evaluation, and a language and educational analysis evaluation.

*Id.* at 88. Social workers performing the evaluations are not to have caseloads exceeding fifteen cases per week. *Id.* Only individualized, culturally adjusted intelligence tests may be employed in the testing process. *Id.* Adequate testing should take approximately fifteen hours, and require the services of one psychologist for every three persons classified per week. *Id.* The

individualized treatment plan developed must then be implemented under the supervision of appropriate TYC personnel.

The District Court attached considerable significance to contact with peers of the opposite sex as "an absolutely necessary condition for normal healthy adolescent growth." *Id.* at 99. Thus, contrary to the prior pattern of assigning girls and boys to separate institutions, the trial court required that a coeducational living environment be arranged, "except in the case of very small facilities for one sex only, which must provide frequent and regular contacts with members of the opposite sex in a variety of settings." *Id.* at 100–01.

The requirements sketched here convey some sense of the detailed specificity of the District Court's decision, but they cannot hope to give a full picture of its breadth. No mention has been made, for example, of the complex procedural safeguards ordained with regard to imposition of solitary confinement and other forms of discipline, particularly corporal punishment, *id.* at 72–84, or of the statewide monitoring system responsible among other things for reporting possible violations of the court's order. *Id.* at 121. Enough has been said, however, to make it apparent that the relief granted, like the relief sought, was clearly aimed at alleviating allegedly constitutional deficiencies in the operation of the TYC, and at requiring a comprehensive restructuring of TYC policies and programs.

## II. The Necessity for Convening a Three-Judge Court

In order to evaluate whether we are required to remand this case for consideration by a three-judge district court, we turn first to the language of the controlling statute, 28 U.S.C. § 2281:

> An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be

granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

The Supreme Court has made it clear that this is a technical statute, which is to be strictly construed. *See, e. g., Gonzalez v. Automatic Employees Credit Union,* 419 U.S. 90, 95 S.Ct. 289, 294, 42 L.Ed.2d 249 (1974); *Board of Regents of the University of Texas System v. New Left Education Project,* 404 U.S. 541, 545, 92 S.Ct. 652, 655, 30 L.Ed.2d 697 (1972); *Allen v. State Board of Elections,* 393 U.S. 544, 561, 89 S.Ct. 817, 829, 22 L.Ed.2d 1, 15 (1969); *Phillips v. United States,* 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800, 804–05 (1941). At the same time,

> Congress has determined that three-judge courts are desirable in a number of circumstances involving confrontation between state and federal power or in circumstances involving a potential for substantial interference with government administration.

*Allen v. State Board of Elections, supra,* 393 U.S. at 562, 89 S.Ct. at 830, 22 L.Ed.2d at 15. In the often-quoted phrase of Justice Frankfurter, "[t]he crux of the business is procedural protection against an improvident state-wide doom by a federal court of a state's legislative policy." *Phillips v. United States, supra,* 312 U.S. at 251, 61 S.Ct. at 483.

■ Summarizing the requirements of section 2281, we have indicated that a three-judge court is not necessary unless

(1) a state statute with state-wide applicability is challenged, (2) an "officer of such state" is sought to be restrained; (3) injunctive relief is sought, and (4) there is a substantial question as to the validity of the statute under the Federal Constitution.

*Holt Civic Club v. City of Tuscaloosa,* 5 Cir., 1975, 525 F.2d 653, 655. Only the first of these requirements is in question here; it is conceded that the others are met by this case. It is important to note that "the word 'statute' in [§ 2281] is a compendious summary of various enactments, by whatever method they may be adopted, to which a State gives her sanction . . . ." *American Federation of Labor v. Watson,* 327 U.S. 582, 592–93, 66 S.Ct. 761, 766, 90 L.Ed. 873 (1946). With regard to the first requirement, the Supreme Court has stated that the three-judge court procedure is brought into play in any

> suit which seeks to interpose the Constitution against enforcement of a state policy, whether such policy is defined in a state constitution or in an ordinary statute or through the delegated legislation of an "administrative board or commission."

*Phillips v. United States, supra,* 312 U.S. at 251, 61 S.Ct. at 483. The central question on this appeal is thus whether plaintiffs' action seeks to "restrain[ ] the enforcement, operation or execution" of a state policy with statewide applicability. *See* 28 U.S.C. § 2281.

■ Plaintiffs maintain that far from attacking any state statute or policy, their suit is aimed at securing enforcement of legislative policies favoring rehabilitation of youths in the custody of the TYC. While the statute creating the TYC does speak of providing "a program of constructive training aimed at rehabilitation and reestablishment in society of children adjudged delinquent by the courts of this state," [8] and Texas legislative policy thus appears to sanction the goal of rehabilitative treatment, it is clear from the preceding description of the relief sought and granted that this action is an attack on the rules, regulations, policies and practices of the TYC *as applied and implemented.* To hold that no three-judge court is required because plaintiffs were seeking to effectuate rather than challenge state policy would be to ignore the obvious thrust of their complaint.

More to the point is plaintiffs' contention that the District Court was correct in concluding that the TYC was not in fact gov-

8. *See* Vernon's Tex.Civ.Stat.Ann., art. 5143d, § 1 (1971).

erned by any uniform statewide policies and hence, that no state policies of sufficient generality to warrant three-judge treatment have been challenged. 383 F.Supp. at 60–64. The District Court drew attention to the facts that there appeared to be no central body of written regulations governing all TYC institutions, and that the regulations and policy directives of the TYC were scattered among minutes of TYC Board meetings, Attorney General's opinions and other such sources, which had never been collected or indexed. The lower court also noted that due to the wide discretion conferred on superintendents of each of the TYC schools in formulating programs, services, and ground rules in their respective institutions, there were "vast differences" in the operative policies and procedures at the various TYC facilities.

The District Court erred, however, in failing to recognize that a number of broad, generally applicable policies were challenged by the plaintiffs' action. As enumerated in the brief for the State of Texas, these included, *inter alia*: (1) the TYC's initial placement and classification policy, according to which incoming juveniles would be committed to one of two reception centers for testing and then assigned to a particular TYC facility without development of a treatment program; (2) the statewide policy of permitting such disciplinary measures as extended solitary confinement and excessive corporal punishment without adequate procedural safeguards; (3) the failure to provide minimally adequate academic and vocational education for TYC inmates; (4) the TYC's staffing and hiring policies; (5) the TYC's policy of dealing with juvenile delinquents primarily by placing them in large rural institutions, rather than relying on community-based treatment facilities; and (6) inmate mail

censorship. Another statewide policy is reflected in the TYC's current practice of assigning incoming juveniles to male or female institutions according to sex. Although it is not clear from the District Court's opinion precisely how the "coeducational living environment" mandated there is to be structured, it is apparent that current policy would need to be substantially modified to comply with the court's decision. It should also be noted that the plaintiffs' action challenges the TYC's policy of allowing institutional superintendents, and to a lesser degree, other TYC personnel, wide discretion in formulating and administering programs and dealing with juveniles committed to their care. While plaintiffs lay great emphasis on individualized treatment and criticize the degree of regimentation in TYC institutions, thus calling in a sense for increased exercise of discretion on the part of TYC personnel, they seek to subject such discretion to a broad range of constraints in the form of procedural safeguards and minimum standards which are currently alleged to be lacking. Overall, then, despite the fact that many of these programs and policies have not been reduced to writing or otherwise formalized, it is apparent that plaintiffs have launched an exhaustive attack on a set of practices and policies which, taken as a whole, constitute Texas' statewide program for dealing with juvenile delinquents.[9] The relief sought and granted is the "interdiction of the operation at large of [a] statute" as contemplated by section 2281. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 155, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963). The practices challenged "partake of the quality and dignity of those state statutes or policies that three-judge courts were designed to consider." *Board of Regents of the University of Texas System v. New Left Education*

---

**9.** This case is thus very different from *Leonard v. Mississippi State Probation and Parole Bd.*, 5 Cir., 1975, 509 F.2d 820, *cert. denied*, 423 U.S. 998, 96 S.Ct. 428, 46 L.Ed.2d 373, in which we held that a three-judge court was not required to hear a case involving a challenge to a prison administrative practice where no "nexus exists between any administrative rules and the administrative practice sought to be enjoined"

and where "the administrative practice is simply amorphous." 509 F.2d at 823. The practices challenged here reflect a number of broad policies governing TYC operations. Although the exercise of administrative discretion in managing affairs at different TYC facilities results in local variations on statewide themes, we cannot say that the practices involved here are "simply amorphous."

*Project*, 404 U.S. 541, 545, 92 S.Ct. 652, 655, 30 L.Ed.2d 697 (1972).[10]

The fact that the policies in question here have not, for the most part, been codified in the form of written rules or regulations does not detract from our conclusion that a three-judge court must be empanelled to hear this case. Faced with similar facts in the *Baker v. Estelle* portion of *Sands v. Wainwright*, 5 Cir., 1973, 491 F.2d 417 (*en banc*), *cert. denied, sub nom., Guajardo v. Estelle*, 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974), we held that a class action challenging practices of the Texas Department of Corrections in the areas of prison disciplinary procedures and censorship of attorney-inmate correspondence must be heard by a court of three judges. Rejecting the attempt of the plaintiffs in that case to distinguish between "practices" and "regulations," we held that

[t]he "practices" whose enforcement the inmates seek to enjoin are, in reality, the Rules and Regulations of the Texas Department of Corrections, *as applied.* Plaintiffs claim that no particular paragraph or section of those Rules and Regulations—either the 1953 version in effect at the time this litigation was initiated, or the July 9, 1973, version currently in effect—is constitutionally offensive, and that no injunction is sought against any such paragraph or section. The entire thrust of plaintiffs' argument, however, is that the Rules and Regulations, *as a whole* and *as applied*, are constitutionally deficient standing alone.

491 F.2d at 428 (emphasis in original). Plaintiffs here make much of the fact that in *Baker*, there was a tangible set of rules and regulations which were being challenged as applied.[11] In our view, however,

---

**10.** In contrast to *New Left*, which involved rules applicable to only three of Texas' fifty-four state colleges, the present action challenges the statewide operation of Texas' youth correction system.

**11.** In this regard, appellees cite *Ault v. Holmes*, 6 Cir., 1974, 506 F.2d 288, a footnote in *Baxter v. Palmigiano*, —— U.S. ——, ——, 96 S.Ct. 1551, 1555 n. 2, 47 L.Ed.2d 810 (1976) and *Newman v. Alabama*, 5 Cir., 1974, 503 F.2d 1320, cert. denied, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975). *Ault* involved actions challenging the constitutionality of unwritten procedures which allegedly denied prisoners a right to a hearing before being transferred out of state to continue service of the remainder of their terms in penitentiaries of other states. Some mention was made of the fact that the plaintiff prisoners in *Ault* attacked only unwritten procedures. 506 F.2d at 290. However, the case is clearly distinguishable, since the court's ruling that a three-judge court was unnecessary rested on the fact that the informal policies which were challenged there affected only two of Kentucky's seven penal institutions. *Id.* at 291.

In *Palmigiano*, a prisoner challenged the constitutionality of a decision of a Rhode Island prison disciplinary board consigning him to punitive segregation on the grounds that he was deprived of his right to counsel and to remain silent during the prior disciplinary hearing. After noting that the applicable regulations were statewide in effect, the court went on to state,

The rules on their face, however, although regulating in some detail the procedures required in prison disciplinary hearings, do not

expressly grant or deny, or even mention, the right to counsel where charges brought are also a crime under state law. Nor do they suggest, one way or the other, whether an inmate's silence may be used against him in the proceeding itself. Palmigiano's complaint did not mention or challenge any rule or regulation of the [Rhode Island Adult Corrections] Authority; nor did it seek an injunction against the enforcement of any identified rule. What it asked was that the Board's disciplinary decision be declared invalid and its enforcement enjoined. Neither Palmigiano nor the State asked or suggested that a three-judge court be convened. It would not appear that the District Court considered the validity of any of the Authority's rules to be at stake. That court ruled Palmigiano was not entitled to be represented by counsel, not because the applicable rules forbade it but because it considered the controlling rule under the relevant cases was to this effect.

In *Palmigiano*, no three-judge court was required because there was a policy vacuum in the precise area of concern to the prisoner. Unlike plaintiffs in the present case, Palmigiano did not seek to enjoin any identifiable state policies or rules.

Like *Palmigiano, Newman* is distinguishable because it involved a challenge to an aspect of a state program not covered by any operative regulations or policies. In *Newman*, we held that the principles announced in *Baker v. Estelle* did not require convening a three-judge court to consider a claim that medical care dispensed in Alabama prisons was constitutionally deficient. Contrasting the disciplinary pro-

the policies in the present case are just as identifiable, just as significant, and just as surely imbued with the imprint of state sanction as those in *Baker*.

Here, as in *Baker*, plaintiffs

seek more than hollow symbolic relief. If a federal court were to uphold the constitutional arguments by plaintiffs' counsel throughout this litigation, that court would have to insist that new regulations be instituted and that further enforcement of present regulations, unmodified, be enjoined.

*Id.* at 428. If anything, the relief sought in the present case is more deserving of three-judge treatment than that in *Baker*. There, the relief sought was limited to the enjoining of allegedly unconstitutional practices with regard to two areas of prison life. Here, granting the relief sought would entail extensive alterations in virtually every phase of TYC operations. It is precisely this type of thoroughgoing disruption of a state's autonomous implementation of its own legislative and administrative policies that warrants the added deliberation and procedural protection provided by the three-judge court statute. We accordingly remand this case for proper empanelling of a three-judge court. In the

cedures and mail censorship practices attacked in *Baker* with the deficient medical care in *Newman*, we noted that Alabama Prison System

is not governed by any uniform practice or procedure in the administration of medical care, beyond the purported uniform practices of neglectful treatment dispensed at the various prison locations throughout the state.

503 F.2d at 1327. In the present case, it is quite clear from the enumeration of statewide TYC policies potentially affected by the litigation that more is at issue than a uniform practice of neglectful treatment—that operative state policies rather than the existence of a policy vacuum is challenged.

Close examination of the factors relied upon by this court in reaching the conclusion that *Baker* was not applicable in *Newman* support the conclusion that it is applicable here. In *Newman*, we stated that

the import of our disposition of the claims presented by Baker is that the complaint's failure to explicitly challenge the constitutionality of a specific regulation will not vitiate the need to convene a three judge court, where the relief sought, if granted, would inexorably condemn those promulgated rules and regulations not specifically challenged. Adoption of the contrary view would have been tantamount to sanctioning the resort to semantical and legal artifices, a practice which should be steadfastly abjured.

503 F.2d at 1326–27. We read this passage not as a hypertechnical insistence that formal promulgation of state policies is a necessary prerequisite for access to the procedural protections of the three-judge court statute, but as a refusal to allow form to triumph over substance in determining whether constitutional challenges to identifiable state policies and practices warrant three-judge court treatment.

In distinguishing *Baker*, the *Newman* court noted that the practices in *Baker* "had in fact been ordained by the [Texas Department of Corrections], and . . . were amenable to codifi-

cation in [written] form." 503 F.2d at 1327. The practices challenged in the present action were clearly ordained by the TYC, either directly or by appropriate delegation, and are sufficiently identifiable to be amenable to codification. While it would be "sheer sophistry" to suppose that Alabama would articulate a policy of affording prisoners hopelessly inadequate medical care—in part, no doubt, because the conception of "adequate medical treatment" is sufficiently clear and noncontroversial that it is impossible to conceive a state agency *ordaining* deficient care—the existence of widely divergent views with regard to the operation of youth correction facilities makes it quite plausible to think that many of the policies complained of here would be formally sanctioned by a state. Indeed, the State of Virginia was allowed to appear as an amicus curiae precisely because of the precedential impact the decision of the merits of this case may have on youth correction programs in that state.

The *Newman* court further distinguished *Baker* on the grounds that "granting the requested relief will not eviscerate any regulations governing medical care in the APS." 503 F.2d at 1327. In contrast to *Newman*, granting the relief requested in this case would have a profound impact on the operating policies and procedures of the entire TYC system. Finally, the *Newman* court noted "the state not only questions the constitutional significance of medical conditions alleged to pervade the APS, but also contests whether in fact any uniform practice exists." 503 F.2d at 1327–28. While a state cannot waive the protection afforded its legislative policies by three-judge courts because of the jurisdictional nature of 28 U.S.C. § 2281, the state's view with regard to whether a policy of statewide significance is under attack in a particular case is entitled to considerable weight in determining whether a three-judge court issue exists. Like the other *Newman* factors, this consideration supports rather than weakens the conclusion that *Baker* is controlling in the present case.

interest of judicial economy, we note that the record amassed in the single-judge proceeding may of course be used in the three-judge court's disposition of this case.

REVERSED AND REMANDED.