Alicia MORALES et al.,
Plaintiffs-Appellees,

v.

James A. TURMAN, Individually and in his Official Capacity as Executive Director of the Texas Youth Council, et al., Defendants-Appellants.

No. 74–3436.

United States Court of Appeals,
Fifth Circuit.

Nov. 11, 1977.

Rehearing and Rehearing En Banc Denied Dec. 16, 1977.

994

**995**

AINSWORTH, Circuit Judge:

This matter is being considered by us on remand from the Supreme Court which held, contrary to our previous ruling, that determination of this case by a three-judge court was unnecessary. *See Morales v. Turman,* 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977).

On February 12, 1971, this class action on the behalf of those involuntarily committed to the custody of the Texas Youth Council (TYC) was filed against Dr. James A. Turman, then Executive Director of TYC, members of TYC, superintendents of TYC schools, and other employees responsible for the supervision of juveniles committed to TYC's custody. Although the suit was originally to secure private access to counsel, *see Morales v. Turman,* E.D.Tex., 1971, 326 F.Supp. 677, it later included a broad range of issues regarding the nature and adequacy of TYC programs and procedures.

As the action expanded the District Court entered orders allowing the plaintiffs wide access to TYC institutions for the purposes of study and observation. *See Morales v. Turman,* E.D.Tex., 1972, 59 F.R.D. 157. In August 1973 the District Court issued a preliminary injunction which proscribed some TYC practices and activities. *Morales v. Turman,* E.D.Tex., 1973, 364 F.Supp. 166. The basis for this relief was the "cruel and unusual punishment clause" of the eighth amendment and plaintiffs' alleged right to treatment under the federal constitution and state statutes. *See id.* This interim order was followed a year later with a seventy-page decision and order. *Morales v. Turman,* E.D.Tex., 1974, 383 F.Supp. 53.

This Court then determined that because the suit enjoins a state-wide pattern of legislative and administrative policies, the three-judge court requirement of 28 U.S.C. § 2281 was triggered. *See Morales v. Turman,* 5 Cir., 1976, 535 F.2d 864, 869–74. Accordingly, the case was remanded for a three-judge court. As we have indicated, that holding was reversed by the Supreme Court.

John L. Hill, Atty. Gen., Thomas W. Choate, Asst. Atty. Gen., Austin, Tex., Robert F. Salter, Gatesville, Tex., for defendants-appellants.

Andrew P. Miller, Atty. Gen., Robert E. Shepherd, Jr., Asst. Atty. Gen., Richmond, Va., amicus curiae, for Commonwealth of Va.

Steven Bercu, El Paso, Tex., Peter B. Sandmann, Youth Law Center, Robert L. Walker, San Francisco, Cal., for plaintiffs-appellees.

Roby Hadden, U. S. Atty., Tyler, Texas, William Malcom Logan, Jr., Office of Insts. & Facilities, Civil Rights Div., Dept. of Justice, Washington, D. C., Neal J. Tonken, Atty., U. S. D. of J., Washington, D. C., Frank M. Dunbaugh, Deputy Asst. Atty. Gen., Dept. of Justice, Civil Rights Div., Washington, D. C., amicus curiae, for U.S.A.

Patricia M. Wald, Jane Bloom Yohalem, Atty., Paul R. Friedman, Norman S. Rosenberg, Mental Health Law Project, Washington, D. C., amicus curiae, for American Orthopsychiatric Assoc., et al.

Before AINSWORTH, MORGAN and RONEY, Circuit Judges.

■ On additional consideration we now conclude that this case must be remanded for a further evidentiary hearing concerning changes that have occurred in TYC. Extensive changes appear to have taken place. Thus an additional hearing is necessary to complete the record with TYC being afforded a full opportunity to present proof of such changes. Further, we have considerable doubts about the legal theory of a right to treatment that was relied on so heavily by the District Court.

■ The trial court's denial of the defendant's original motion to reopen the record was improper if TYC had sufficiently altered its operations at that time to warrant the receipt of additional evidence. Reopening the case for additional evidence is normally a discretionary matter for the trial court to decide. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). However, the circumstances of this case may render the denial of the motion an abuse of discretion.

■ Moreover, the changes in TYC's operation indicated in the defendants' brief are relevant to any injunctive relief that might be granted. The cases cited by the District Court are not to the contrary. For example, *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), notes that the defendant's voluntary cessation of antitrust violations does not moot the case. However, the Supreme Court said in *W. T. Grant* that the cessation of a violation by the defendant will require the plaintiff to show that injunctive relief is still necessary. Many of the objectionable practices in the Texas juvenile system may already have been ended. Further, these changes may indicate a new attitude on the part of TYC that would eliminate the risk of further constitutional violations. Thus, new procedures adopted by the TYC would significantly alter or reduce the scope of any injunctive relief.

■ Consideration of additional evidence is especially important here as we are dealing with a significant federal intrusion into a state's affairs, and we should refrain from interference in state affairs unless necessary. State governments have wide discretion in dealing with their affairs. *See Rizzo v. Goode,* 423 U.S. 362, 366, 379–80, 96 S.Ct. 598, 602, 608, 46 L.Ed.2d 561 (1976); *Newman v. Alabama,* 5 Cir., 1977, 559 F.2d 283. Hence, if Texas has already brought its detention facilities up to constitutional standards, we should be reluctant to impose additional restraints. Finally, limiting injunctive relief allows the state greater freedom to experiment with new programs for the treatment of juveniles.

These considerations which should have led to a reopening of the record in 1974 in the District Court have grown stronger with the additional passage of time. All of the arguments for permitting the state to show a change in circumstances continue to apply with greater force today.

While an evidentiary hearing will be necessary to determine the full magnitude of the changes in TYC, the supplemental brief for the TYC officials outlines some of the changes that allegedly have been made. A brief examination of a few of the major reforms alleged to have been made indicates, if true, a new attitude on the part of TYC and suggests that a fuller investigation of these claims would be useful.

Significant changes have allegedly taken place in the TYC's treatment of youths. Noninstitutional settings for the care of juveniles has been emphasized to the extent that the declining institutional population has resulted in the state's closing three of the facilities at Gatesville and transferring the Mountain View facility, a major focus in the initial trial, to the Texas Department of Corrections. For those students who are still institutionalized new programs have been developed. For example, for those youths whose evaluation indicates the need for developing self-reliance TYC operates a therapeutic wilderness camp that includes both survival skills and academic instruction. For all juveniles in its care TYC is developing a treatment program that will develop living, learning and working skills. New staff members, often members of mi-

nority groups, have been hired to help implement these programs.

We are told that TYC has also made significant procedural changes to reduce the likelihood that a child will be abused while in custody. TYC has established a grievance system for the juveniles with time requirements to ensure the efficient processing of the complaints. In addition, a follow-up report determining the student's satisfaction or dissatisfaction with the action taken on his grievance must be obtained. Finally, the youth is provided with a full and fair opportunity to appeal an adverse decision on his grievance.

Admittedly, these statements in the defendant's brief, if proven, do not ensure that the serious abuses found by the District Court, such as beatings and prolonged solitary confinement, have been eliminated. However, they do indicate a new atmosphere within TYC which makes such conduct unlikely and suggest that further inquiry into the current conditions of these institutions should be made. Also the reforms noted here are highly relevant to many of the detailed minimum requirements set forth in the District Court opinion.

■ Although the District Court has only ordered the parties to negotiate a plan for final relief, negotiations between the parties could not adequately incorporate these changes in the operation of TYC. To guide the negotiations the District Court has set forth extremely detailed minimum standards for the operation of TYC's facilities. Under these standards, for example, TYC must: (1) administer to all youths newly committed to their care Leiter and Weschler IQ tests standardized for blacks and Mexican Americans, *Morales v. Turman, supra,* 383 F.Supp. at 88; (2) have each student assessed by a language pathologist, *id.* at 90; (3) provide a coeducational living environment, *id.* at 100, and (4) provide a psychological staff with psychologists holding either masters or doctorates in psychology and experienced in work with adolescents, *id.* at 105. Many other similar requirements may be found in the District

Court opinion. Because of this detail, TYC will lack the opportunity to show during negotiations that the changes they have initiated now satisfy constitutional standards even if all the specific requirements of the District Court opinion have not been met. Since the proper treatment of juveniles is a matter of dispute, the standards set forth by the District Court cannot be said to be the only constitutional method for rehabilitating juveniles. Therefore, the District Court must examine the new operations since only those aspects that continue to fail constitutional standards can be enjoined.

For the reasons stated above, we find it necessary to remand this case for further evidentiary hearings. Since additional hearings may influence the relief granted we do not now decide the legal issues presented. We do, however, have reservations concerning the right to treatment theory relied on by the District Judge. In order to expedite a final disposition of this action, our difficulties with this theory are set out below.

A right to treatment for juvenile offenders has not been firmly established. Only in recent years have courts discussed such a right. *See, e. g., Rouse v. Cameron,* 1966, 125 U.S.App.D.C. 366, 373 F.2d 451 (Bazelon, J.). This right has been defended on two grounds. First, supporters of the doctrine argue that a permissible governmental goal must justify any nontrivial abridgement of a person's liberty. For instance, exercise of the state's *parens patriae* power to provide care or supervision is assumed as the permissible goal for committing juveniles or the mentally incompetent. Treatment must therefore be provided to prevent the exercise of the *parens patriae* power from merely being a pretext for arbitrary governmental action. Second, the right to treatment is viewed as a *quid pro quo* for reduced procedural protections. Whenever the state detains a person not in retribution for a specific offense, for an unlimited period of time or without the full procedural safeguards of a criminal trial, proponents of this right claim that due process requires

that the person deprived of his liberty be in return entitled to treatment. To date most of the cases embracing this theory have involved the civil commitment of the mentally ill. *See, e. g., Wyatt v. Aderholt,* 5 Cir., 1974, 503 F.2d 1305; *Donaldson v. O'Connor,* 5 Cir., 1974, 493 F.2d 507, aff'd on other grounds, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Stachulak v. Coughlin,* N.D.Ill., 1973, 364 F.Supp. 686.

 These rationales for a right to treatment for the mentally ill raise serious problems. The civil commitment of the mentally ill without treatment is not necessarily an impermissible exercise of governmental power. The Constitution does not specify in what manner a state may exercise its *parens patriae* power. Historically, the states merely provided custodial care for the incompetent or mentally ill. *See O'Connor v. Donaldson,* 422 U.S. 563, 582–83, 95 S.Ct. 2486, 2497, 45 L.Ed.2d 396 (1975) (citing A. Deutsch, The Mentally Ill in America, 38–54, 114–131 [2d ed. 1949]) (Burger, C. J., concurring). The second basis for the right to treatment doctrine, *i. e.,* compensation for reduced procedural protections, is also questionable. The interests of the individual and of society in the particular situation determine the standards for due process. *See, e. g., Morrissey v. Brewer,* 408 U.S. 471, 480–84, 92 S.Ct. 2593, 2599–601, 33 L.Ed.2d 484 (1972); *McKeiver v. Pennsylvania,* 403 U.S. 528, 543, 91 S.Ct. 1976, 1985, 29 L.Ed.2d 647 (1971). A state should not be required to provide the procedural safeguards of a criminal trial when imposing a quarantine to protect the public against a highly communicable disease. *See Jacobson v. Massachusetts,* 197 U.S. 11, 29–30, 25 S.Ct. 358, 362, 49 L.Ed. 643 (1905). Finally, treatment of the mentally ill is an extremely delicate task. Even experts in the field disagree as to the appropriate treatment and indeed if any treatment will be successful for a given patient. *See*

Szasz, The Right to Health, 57 Geo.L.J. 734, 741 (1969). To attempt to specify the type of treatment that should be provided may well be beyond the competence of federal judges.

The case law has not universally accepted a right to treatment for the mentally ill. Further, in a recent case involving the right to treatment for the mentally ill, the Supreme Court held only that a nondangerous person could not be confined without treatment. *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). The Court did not, however, decide whether a nondangerous person could be confined with treatment or if a dangerous person could be confined without treatment. *Id.* 422 U.S. at 572, 95 S.Ct. at 2492.

The argument for a right to treatment is even less strong as related to juvenile offenders. Many of the detained juveniles will have committed acts that clearly pose a danger to society. *Donaldson* left open the appropriateness of confining such individuals without treatment. *Id.* In addition, since many of the acts that result in a juvenile's detention would be crimes if committed by adults and since adult offenders do not have a right to treatment, a right to treatment for juveniles may be less appropriate than a similar right for the mentally ill. Of course, as a matter of social policy choosing a policy of rehabilitating juvenile offenders may be desirable.

 While a right to treatment is doubtful, any constitutional abuses that may be found in the Texas juvenile program can be corrected without embracing such doctrine in this case. The eighth amendment prohibition of cruel and unusual punishment as the constitutional standard for the conditions of imprisonment can adequately remedy the conditions in TYC's institutions.[1] For instance, the physical

---

1. The eighth amendment applies to juvenile detention centers as well as to adult prisons. *See Lollis v. New York State Department of Social Services,* S.D.N.Y., 1970, 322 F.Supp. 473.

Even in some of the cases that refer to a right to treatment for juvenile offenders the conduct involved actually violated the eighth amendment and could have been decided merely on that basis. For example, in *Pena v. New York State Division for Youth,* S.D.N.Y., 1976, 419 F.Supp. 203, the opinion was written in terms of a right to treatment. However, the actual

abuse of the students and degrading work assignments could be eliminated as cruel and unusual without adopting the questionable doctrine of a right to treatment. Admittedly the eighth amendment will not require the state to provide extensive vocational training, detailed personality assessments or coeducational facilities. The choice of providing these services properly remains with the State of Texas herein.

■ Finally, even if some form of right to treatment doctrine exists the minimum requirements established by the District Court are excessively detailed.[2] A court is not in a position to monitor day-by-day changes that affect rehabilitation programs. New treatments and testing techniques will inevitably develop. A rigid set of requirements for the state will not enable the TYC to adequately adjust to these changes. The passage of time will render obsolete many of the requirements found in the District Court opinion.

REMANDED FOR FURTHER PROCEEDINGS.

conduct at issue was prolonged isolation, unsupervised administration of medication and physical restraints. These conditions could have been adequately prohibited under the cruel and unusual standards.

2. Detailed standards have been used in some cases involving prison conditions. *See, e. g., Williams v. Edwards,* 5 Cir., 1977, 547 F.2d 1206. But detailed standards may be more appropriate in the context of eighth amendment relief than in the context of a right to treatment. An order that guards stop beating prisoners or that inmates be adequately protected in their cell blocks will prevent cruel and unusual punishment of prisoners. But a court cannot be sure of achieving rehabilitation by requiring, for example, a state to give all juveniles the Weschler IQ test adjusted for minority youths.