In the Matter of M. E., a child under the age of 18.

No. J–77–512.

Court of Criminal Appeals of Oklahoma.

Feb. 22, 1978.

Rehearing Denied March 17, 1978.

Certiorari Denied May 22, 1978.

See 98 S.Ct. 2271.

Baker, Baker & Martin, Jay C. Baker and C. Rabon Martin, Tulsa, for appellant.

David Young, Dist. Atty., Sapulpa, for appellee.

## OPINION

BUSSEY, Presiding Judge.

M.E., a juvenile, appeals from an Order of the Juvenile Division of the District Court, Creek County, Case No. J–77–34, waiving jurisdiction over him and certifying him to stand trial as an adult for the offense of Murder in the First Degree.

Briefly stated, the facts adduced at the hearing are as follows. On April 4, 1977, M.E., hereinafter preferred to as the juvenile, age 16, and Gary Molt, age 14, ran away from their homes in Camdenton, Missouri. The juvenile apparently took three of his father's rifles—two .410 shotguns, and a .30–.30 rifle. The two boys drive to Joplin, Missouri where they picked up the juvenile's sister, Rhonda Eddings, and her friend Terry Clevenger, both age 14. The four then headed west on Interstate 40 in their red Volkswagen.

Just before getting onto the Turner Turnpike in Tulsa, the juvenile, who had driven the entire time, stopped to pick up a hitchhiker, Timothy Wayne Thomas, who got into the front passenger's seat. After stopping for a coke and to use the restroom at a concession stop on the Turner Turnpike, the juvenile lost control of his vehicle which went over a curb into a barrow ditch before the juvenile could regain control and pull it back onto the highway. Shortly thereafter a highway patrol car was observed following them and the juvenile was heard to say, "If that cop hassles me, I'm going to shoot him." When the highway patrol officer turned on his red light, the juvenile grabbed a sawed-off shotgun from the back seat, loaded it and cocked it. He then stopped the car and awaited the approach of Trooper Crabtree. When the officer was but a few feet away the juvenile stuck the gun through the open window and shot him in the chest. The juvenile then drove away, directing his friends to throw the other guns out of the vehicle as he did the same with the death weapon.

Another highway patrolman, Joe J. Inman, proceeding in the other direction, observed Trooper Crabtree approaching a red Volkswagen but concluded that he was only involved in a stop for a routine traffic violation. Shortly thereafter he received a call for help over the radio, reporting a wounded officer. After returning to the scene, Officer Inman started to pursue the red Volkswagen. The juvenile was subsequently arrested.

During the second stage of the certification hearing dealing with the question of

the juvenile's amenability to rehabilitation within the juvenile system, Dr. R.D. Garcia, M.D., the chief forensic psychiatrist at Eastern State Hospital, and Dr. H. Brent Dietsche, Ph.D., a clinical psychologist at Eastern State Hospital, testified that the juvenile knew the difference between right and wrong and was capable of understanding the consequences of his actions. Furthermore, Dr. Garcia went on to state that the juvenile had no mental disorder but had an anti-social personality which he asserted was not amenable to treatment in the medical sense. Dr. Garcia and Mr. Don McAllister, an intake counselor for Court Related and Community Services, both stated that, in their opinion, the juvenile was not amenable to treatment within the juvenile system.

Furthermore, the court had before it evidence of the juvenile's record in the State of Missouri. Mr. Stephen Dorn, juvenile officer for the 26th juvenile district, State of Missouri, testified that the juvenile was first referred to his office in November of 1975, after having been charged with four counts of burglary, second degree, and one count of tampering with a motor vehicle. A petition was filed against the juvenile on the 28th of November, 1975, he was found a delinquent and made a ward of the court. A supplementary petition was filed against the juvenile on September 17, 1976, for assault with intent to do bodily harm. Finally on November 21, 1976, while he was still living in the "group home" a petition was filed against the juvenile for "burglary second degree and stealing." Mr. Dorn testified that the juvenile's conduct in the "group home" steadily worsened until he was sent back to the custody of his parents. Mr. Dorn stated that the Missouri juvenile rehabilitation system failed with the juvenile and asserted that he knew of no juvenile program in Missouri capable of rehabilitating him.

The juvenile presented two witnesses on the issue of amenability to rehabilitation: Dr. Richard Pearson Rettig, Ph.D., an associate professor of behavioral science at Oral Roberts University, and Dr. Anthony C. Gagliano, D.O., an osteopathic physician specializing in psychiatry. Both asserted that the juvenile could be rehabilitated. Furthermore, Dr. Gagliano asserted that at the time of the shooting, the juvenile did not know the difference between right and wrong.

The juvenile's first assignment of error concerns three aspects of the right to counsel. Counsel for the juvenile contends that he was not given adequate time to prepare, that he was denied any opportunity for confidential conference with his client, and that he was not given access to certain reports which were introduced into evidence by the State during the testimony of Stephen Dorn.

First, it is necessary to closely examine the chronology of events relative to the issue at hand. On April 4, 1977, the juvenile was arrested for the murder of Trooper Crabtree.[1] On April 5, 1977, the juvenile accompanied by his parents, Ronnie Eddings and Mary Kenny[2], appeared before the Honorable Streeter Speakman, Associate District Judge, Creek County, whereupon hearing of the State's motion for certification of the juvenile was set to begin on the 8th of April, 1977.[3]

The juvenile's parents were given a copy of the petition and motion for certification.[4]

At said hearing on the 5th of April, the juvenile's parents agreed to diligently seek counsel in order to expedite the hearing.[5] On April 6, 1977, the juvenile's parents contacted Mr. J. Baker to arrange for him to

---

1. Petition—Page 6 of the Trial Record.

2. Trial Transcript—Vol. I, pages 1 and 3.

3. Trial Transcript—Vol. I, pages 4 and 10.

4. Trial Transcript—Vol. I, page 5.

5. Trial Transcript—Vol. I, page 9.

represent the juvenile in this case.[6] Mr. Baker called the District Attorney's Office on the 7th of May and left word for District Attorney Young to call him, but apparently made no further attempt to inform himself of the proceedings.[7] On the morning of April 8, 1977, Mr. Baker consulted with the juvenile for the first time at the Creek County Jail, although apparently not using all of the time which was made available to him.[8] Furthermore, Mr. Baker declined an opportunity to consult with the juvenile during the noon recess before the State put on its evidence.[9]

After the noon recess, Mr. Baker was given leave by the court to file any motions at a later date.[10] Furthermore, the day's hearing was limited to the evidence concerning prosecutive merit,[11] and the juvenile was to be permitted any reasonable continuance before putting on evidence to rebut prosecutive merit.[12] After the State presented its evidence on prosecutive merit and rested, the hearing was continued for approximately eight weeks, during which time the juvenile was committed for diagnosis and evaluation at Eastern State Hospital.[13] When the first stage of the hearing concerning prosecutive merit was reconvened on the 6th of June, 1977, the juvenile declined to put on any evidence concerning this matter,[14] and the second stage of the hearing was commenced to determine the juvenile's amenability to rehabilitation within the juvenile system.

■ Also, it is important to note that the proceeding involved here was the hearing of a motion to certify the juvenile and not an adjudication of the offense charged. In *Kent v. United States,* 383 U.S. 541, 86 S.Ct.

1045, 16 L.Ed.2d 84 (1966), the Supreme Court ruled in reference to a hearing such as this:

"We do not mean by this to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing . . ."

While we recognize that even in a hearing such as this, the juvenile is entitled to effective assistance of counsel (*Kent v. State,* supra), we are of the opinion that the time required to prepare for the proceeding need not be the equivalent of that required for a trial or even a juvenile adjudicatory proceeding. Therefore, the cases cited by the juvenile relating to adequate time to prepare for *trial* are of little or no precedential value here.

■ In the instant case, the first day of the hearing was limited to evidence concerning prosecutive merit and only the State was required to put on such evidence at that time. The juvenile's attorney was contacted on the 6th of April, 1977, and it would appear that he had ample opportunity to consult with Judge Speakman, District Attorney Young and the juvenile between then and the time of the hearing on the 8th of April—had he diligently sought to do so. Furthermore, the juvenile's attorney was present at the hearing on the 8th of April and carefully cross-examined the witnesses presented by the State. In view of the limited nature of the hearing on the 8th of April and the fact that the juvenile was allowed an 8 week continuance before being asked to put on evidence relating to prosecutive merit, we find that counsel for the juvenile had adequate time to prepare for the hearing.

6. Trial Transcript—Vol. II, page 6.

7. Trial Transcript—Vol. II, page 6.

8. Trial Transcript—Vol. II, page 7.

9. Trial Transcript—Vol. II, pages 8 and 15–16.

10. Trial Transcript—Vol. II, pages 10 and 11.

11. Trial Transcript—Vol. II, pages 5 and 12–13.

12. Trial Transcript—Vol. II, page 8.

13. Trial Transcript—Vol. II, pages 128–129 and 135.

14. Trial Transcript—Vol. III, pages 9–10.

With regard to the lack of any opportunity for private conversation, counsel for the juvenile alleges that when he first went to speak with the juvenile in the Creek County jail, he was denied any access to the juvenile "because of 'orders of the Highway Patrol.'" An appeal to the District Court resulted in an order that he be allowed to confer with the juvenile, but even then he alleged that there were two law enforcement officers positioned outside of the juvenile's cell. The counsel for the juvenile alleges in his brief that even at the time of the writing of the brief, he had never been allowed to speak with the juvenile except in the presence of law enforcement officers.

■ These are serious allegations. Law enforcement officials have no right to be present at attorney/client consultations, but only to take precautions to prevent an escape. *State ex rel. Tucker v. Davis*, 9 Okl.Cr. 94, 130 P. 962, 44 L.R.A.,N.S. 1083 (1913). But in examining the record we find definite deficiencies in the juvenile's counsel's allegations.

■ Counsel had an opportunity to consult with the juvenile in his cell with the officers outside. Not until the 6th of June did counsel even suggest to the court that he was dissatisfied with conferring with the juvenile in his cell. See pages 4–10 of Vol. III of the transcript wherein the District Court addressed this issue. In light of the foregoing, counsel has not demonstrated that he has been denied an opportunity to confer with the juvenile in private. At best, he has only demonstrated that he has not availed himself of the opportunity which the court has provided or would have provided him, upon request. Therefore, this proposition is entirely without merit.

In support of his argument the juvenile's counsel cites several Federal cases which we do not find persuasive. In *United States v. Rosner*, 485 F.2d 1213 (2nd Cir. 1973), the accused contended that his right to counsel was violated when codefendants, who had pled guilty and given some cooperation to the Government, participated in conferences between the defendant and his attorney. In *Adams v. Carlson*, 488 F.2d 619 (7th Cir. 1973), a conference room provided for Federal prisoners and their attorneys was, after a series of disturbances, bisected with a wall of soundproof glass. Attorneys and their clients could converse only through the use of telephones, and materials could not be passed back and forth, but had to be conveyed by a guard, who would go out of the room and around it to the other side, often taking as long as five minutes to make the trip. And in *Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investigation*, 507 F.2d 1281 (8th Cir. 1974), the court was concerned with the standing of an attorney to challenge an invasion of a client's right to counsel; there was no discussion of any actually alleged invasion of that right. All of these cases stand for the proposition that "the essence of the Sixth Amendment right is, indeed, privacy of communication with counsel." *Rosner*, 485 F.2d at page 1224. However, the law of the cases themselves is not at all relevant to the instant case, due to the great factual dissimilarities.

He also cites *Russo v. Byrne*, 409 U.S. 1219, 93 S.Ct. 21, 34 L.Ed.2d 30, (1972), but here again, in an opinion by Justice Douglas sitting as Circuit Justice, the only issue is that of standing. This time the standing of clients to protest the illegal interception of their attorneys' conversations. This case, too, is not in point.

■ The third argument under this assignment of error is that the defendant's right to counsel was violated by the State's failure to make available to counsel the reports and records on which Mr. Dorn relied in giving his testimony. The argument of law for this proposition is contained in the following paragraph:

"It is axiomatic in juvenile law that counsel for the juvenile is to be given access to all records or reports which the court may consider. *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84

(1966); *J.T.P. v. State*, 544 P.2d 1270, (Okl.Cr.1976); *Matter of R. M.*, 561 P.2d 572 (Okl.Cr.1977)."

While this is an accurate statement of the case law, the record discloses that the material at issue was not introduced into evidence and was not considered by the court below. The only evidence presented to the court was Mr. Dorn's testimony concerning the records; and since the counsel for the juvenile was given an opportunity to inspect those records prior to cross-examining Mr. Dorn and then did conduct an extensive cross-examination, we find no error in the procedures used by the court below.

For these reasons we find the first assignment of error to be without merit.

■ In his second assignment of error the juvenile again raises several arguments. First he argues that the State took a backward approach in attempting to establish the juvenile's non-amenability to rehabilitation within the juvenile system. He maintains that instead of proving that he was not amenable, the District Attorney undertook to prove that the State of Oklahoma was not competent to rehabilitate him. And he argues that this approach improperly puts the emphasis on the shortcomings on the State, rather than on the true issue of the juvenile's amenability.

The evidence to which the juvenile refers in this argument is the testimony of Mr. Caywood concerning the rehabilitative facilities and procedures employed by the Department, and the statute then in force— Laws 1974, Chapter 272, § 2—provided eight guidelines to be used by the district court in considering a certification case, of which the eighth is as follows:

"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile if he is found to be guilty of the alleged offense, *by the use of procedures and facilities currently available to the juvenile court*; . . . ." (Emphasis added).

The juvenile argues that this provision should not be construed as referring to the procedures and facilities currently available to the juvenile court, but as referring to "procedures and facilities which could reasonably be employed, if DISRS is interested, concerned and responsible enough to do so." (Brief p. 11).

The procedures and facilities available to the District Court in dealing with a child made a ward of the court have been set forth by the Legislature in Title 10 of the Oklahoma Statutes. Section 1116 provides for four types of disposition by the court: dismissal, probation, custody given to a private agency or institution, and custody given to the Department. Section 1138 provides that when custody of a child adjudicated as a delinquent is vested in the Department, the Department may place the child in a State school for the mentally retarded—if the child is eligible; or place the child in a State-maintained institution or facility for children; or allow the child supervised liberty, either immediately or after a period of time in one of the children's facilities. And Sections 1401–1404 provide for the Department to have the supervision, management, operation and control of children's institutions and to provide for the care, education, training, treatment and rehabilitation of children in such institutions.

Thus, the determination of rehabilitative treatment and procedures is an administrative function vested by the Legislature in the Department. The juvenile argues that the procedures and modes of treatment adopted by the Department are incompetent insofar as they would fail to rehabilitate him. But it is just as likely that the treatment which would be successful with him would fail with someone else. The Department has adopted the treatments and procedures which it deems to be the best for the children which it receives. It is not an indication of incompetence to say that there will be some children for whom those procedures will not work.

■ The juvenile also argues in his second assignment of error that his age

should not be taken into account in determining his amenability to rehabilitation. This argument is based on Laws 1968, Chapter 282, § 139, which authorized the juvenile court, under exceptional circumstances, to retain jurisdiction over a person beyond the age of 21. This statute was in effect at the time the crime was committed, and at the time the certification hearing was held. However, 10 O.S.Supp.1977, § 1102 provides that the court shall lose jurisdiction when a child who has been adjudicated delinquent reaches his or her nineteenth birthday; and Section 1139 directs the Department to release all children when they reach the age of eighteen. These procedural statutes, as amended, would be controlling if the juvenile were to be adjudicated delinquent and committed to the custody of the Department.

Clearly, the length of time which a juvenile is subject to DISRS is an important factor in determining amenability to rehabilitation with the juvenile system.

■ Finally, under the second assignment of error, the juvenile argues that as a juvenile he has a constitutional right of treatment, citing "A Right to Treatment for Juveniles?" Washington University Law Quarterly, 1973:157. This question has never been specifically litigated in this State or in the United States Supreme Court.[15] Assuming for the sake of argument that there is in fact such a right, any treatment could only be administered within the framework of the juvenile system. But the court below found that there was no treatment which could be provided by any resource available to it that would be able to achieve the desired result. For these reasons the second assignment of error is also without merit.

■ Next, the defendant argues in his third assignment of error that the trial court's finding of non-amenability was con-

trary to the weight of the evidence. In that regard he alleges that every witness who testified stated that the juvenile could be rehabilitated. But here again, assuming without deciding that his arguments are sound, the issue before the trial court was not merely whether the juvenile could be rehabilitated, but whether he could be rehabilitated *within the framework of the juvenile system.* The summary of facts set forth above shows that there was evidence to support the finding of the court. This assignment of error is without merit.

■ The juvenile's fourth assignment of error is that the trial court erred in finding that there was prosecutive merit in the case. He bases this assignment on the contention that under the *M'Naghten* Rule, the juvenile was insane at the time the act was committed. The *M'Naghten* Rule— which is the test of criminal responsibility in this State—holds that a person who was capable of distinguishing right from wrong at the time an act was committed is to be held responsible for that act. *Revard v. State,* Okl.Cr., 332 P.2d 967 (1958); *Suits v. State,* Okl.Cr., 507 P.2d 1261 (1973). This rule is applied when a defense of insanity is raised, to determine whether an accused shall be held responsible for the commission of the act charged, and the court does not have to rule on this issue in a certification hearing.

■ As we have previously held, there are two ultimate findings which must be made in a certification hearing. *J. T. P. v. State,* Okl.Cr., 544 P.2d 1270 (1975). The first is that there is prosecutive merit to the complaint; and this is an application of the preliminary hearing test of whether a crime has been committed and whether there is probable cause to believe that the person accused committed it. The second finding is that the juvenile is not amenable to reha-

**15.** The Seventh Circuit Court of Appeals has held that there is a constitutional right to treatment for juveniles. *Nelson v. Heyne,* 491 F.2d 352 (7th Cir. 1974). The Fifth Circuit Court of Appeals has seriously questioned that such a right exists. *Morales v. Turman,* 562 F.2d 993 (5th Cir. 1977).

bilitation within the juvenile system. Neither of these findings necessarily involves the question of whether the juvenile knew right from wrong at the time he or she committed the act charged. If he or she is certified to stand trial as an adult, as the defendant was in this case, then the issue of insanity can be raised as a defense at the criminal trial. And if the juvenile is not certified, then the issue may be raised in the delinquency proceeding. We find this assignment of error to be without merit.

■■■■■ In his final assignment of error, the juvenile argues that Laws 1974, Chapter 272, § 2, which was controlling at the time the act was committed, should be held unconstitutional as violative of both due process and equal protection. He contends that said Statute allegedly violated due process requirements because it gave a juvenile offender no notice of the consequences of an unlawful act. He or she could be certified to stand trial as an adult and prosecuted in a criminal proceeding, or the juvenile could be adjudicated a ward of the court and kept within the juvenile system; and the juvenile maintains that the guidelines by which this decision was to be made under the controlling law were too vague to enable a juvenile to know which would result from his or her act. The juvenile's argument, however, is not to the point. The due process questions of vagueness and notice relate to the ability of a person to determine whether an act is wrong, not whether or not a specific punishment will be imposed for a wrongful act. The statute in question did not pertain to any particular offense. Therefore, this argument has no merit.

■■■■ With regard to equal protection the juvenile contends that the statute created different classes which were treated differently without any rational basis. The distinction set forth by the juvenile is between juveniles who are certified and those who are not, after having committed identical crimes. Asserting that this distinction is based on the concept of amenability to rehabilitation, he argues that that concept does not provide a rational basis for the distinction.

But here again the juvenile's argument is inapposite. The underlying concept of the equal protection clause is that of discrimination. The purpose of the clause is to protect a person or class from being set apart and made the subject of hostile or discriminatory treatment, either by expressly discriminatory legislation or by discriminatory enforcement of legislation. In order to raise an equal protection claim, a person must be able to demonstrate that he or she is a member of a class which has in fact been set apart. This the juvenile has not done. The statute challenged here—as well as its successor, 10 O.S.Supp.1977, § 1112(b) —does not in fact create any classifications.

The juvenile argues that he is in the class of those juveniles who are certified to stand trial as an adult for the commission of a crime, as opposed to those who are not certified, but this is fallacious. The statute provides alternative ways of dealing with an individual juvenile offender, not alternative ways of treating classes of offenders. While amenability to rehabilitation is the determining factor, it is not a guide for putting a person into one or another class. Instead, it is a means of determining which of two equally valid procedures is to be used in dealing with a particular offender. Certification is no more a discriminatory procedure than the decision to place a juvenile on probation rather than vest custody in the Department, or the determination by the executive branch that an individual prisoner should or should not be granted parole. This assignment of error is also without merit.

On the basis of the record we hold that the court below was justified in its findings of prosecutive merit and non-amenability to rehabilitation within the juvenile system. Accordingly, the order of certification is *AFFIRMED.*

CORNISH, J., concurs in results.

BRETT, J., concurs.