Alicia MORALES, et al.

v.

James A. TURMAN, et al.

Civ. A. No. 1948.

United States District Court,
E.D. Texas,
Sherman Division.

June 28, 1983.

Peter B. Sandman, San Francisco, Cal., for plaintiffs.

Jim Mattox, Atty. Gen. of Texas, Richel Rivers, Austin, Tex., Sp. Atty. Gen., for defendants.

## MEMORANDUM OPINION AND ORDER

JUSTICE, Chief Judge.

The joint motion of the parties for approval of a proposed settlement agreement has been presented for consideration by the court.

This civil action was filed on February 12, 1971, by a plaintiff class of children who had been adjudicated "delinquent," and involuntarily committed to the custody of the Texas Youth Council (hereinafter "TYC"). Tex.Rev.Civ.Stat.Ann. art. 2338–1 (Vernon 1971), *repealed* (1973); *cf.* Tex.Family Code Ann. § 51.01, *et seq.* (Vernon 1982 Supp.); Tex.Rev.Civ.Stat.Ann. art. 5143d (Vernon 1971), *repealed* (1979); *cf.* Tex.Human Resources Code § 61.001, *et seq.* (Vernon 1980). In the suit, the children challenged adjudicatory and post-adjudicatory procedures of the juvenile justice system, as well as the conditions of confinement at the TYC institutions. In August 1973, a preliminary injunction was issued prescribing that TYC meet certain minimum standards concerning the use of physical force, corporal punishment, the conditions of segregation and solitary confinement, visitation, mail, and internal due process. *Morales v. Turman*, 364 F.Supp. 166 (E.D.Tex.1973); *see also*, 364 F.Supp. at 175, n. 1. On August 30, 1974, after a six weeks trial, this court issued a seventy-page memorandum opinion and order, finding that TYC had subjected or was subjecting plaintiffs to cruel and unusual punishment, and also to deprivations of due process, equal protection, and their constitutional right to treatment. *Morales v. Turman*, 383 F.Supp. 53 (E.D.Tex.1974). On appeal, the Court of Appeals reversed and remanded the case, finding that a three-judge district court should have considered it. *Morales v. Turman*, 535 F.2d 864 (5th Cir.1976); *see former* 28 U.S.C. § 2281, *repealed* (1976). The Supreme Court thereafter granted a writ of certiorari as to the three-judge court issue and summarily reversed the Court of Appeals. *Morales v. Turman*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977), *rehearing denied*, 430 U.S. 988, 97 S.Ct. 1690, 52 L.Ed.2d 384 (1977). On remand, the Court of Appeals remanded the case to this court, "for a further evidentiary hearing concerning changes that have occurred at TYC," suggesting that if conditions had, in fact, improved as much as defendants claimed, injunctive relief would no longer be appropriate. *Morales v. Turman*, 562 F.2d 993, 996 (5th Cir.1977). The Court of Appeals also expressed "doubts about the legal theory of a right to treatment", as asserted by involuntarily committed juvenile delinquents.

The parties proceeded to engage in extensive formal and informal discovery between 1978 and late 1981, including inspection by counsel for plaintiffs, the United States (as *amicus*), and their "experts in the fields of corrections, medical care, and education." Amended Settlement Agreement, p. 340. During 1982, counsel for plaintiffs and defendants fashioned and formalized a proposed settlement agreement, which they tendered to the court on March 3, 1983. After preliminary approval and notice to class members, a hearing was held April 15, 1983. Although there were no objections from class members, the settlement was disapproved from the bench, because of certain flagrant legal infirmities with the settlement as drafted.[1] The parties sought to cure those flaws, and now have tendered the Amended Settlement Agreement

---

1. It is hardly surprising that a class composed of juveniles would fail to recognize infirmities in the settlement agreement. Whether any of the parents or guardians of the members of the class are aware of the terms of the proposed settlement is unknown to the court.

("Agreement") for this court's approval, pursuant to Fed.R.Civ.P. 23(e).

### The Agreement

The Agreement, it appears, has four major components: (1) dismissal of the case from this court's docket; (2) substantive provisions setting forth TYC commitments, policies, and goals, in numerous areas in which its prior practices had been challenged; (3) a Committee of Consultants,[2] empowered to monitor, and if necessary, to enforce the substantive provisions, by bringing a new lawsuit, in the nature of an action upon a contract; and (4) payment of stipulated attorney's fees to plaintiffs' counsel in the sum of $295,000.00. (The amount of attorney's fees was negotiated after conclusion of the other components of the settlement.)

Although such a structure seems a logical and plausible approach to settlement of an injunctive institutional reform suit, close legalistic inspection of the Agreement reveals that the actual powers of the Committee of Consultants are quite limited, and the success of the settlement depends entirely upon the good faith cooperation of the defendants. Indeed, the Agreement itself recognizes this dependence:

> The parties agree that conditions and the programs in the TYC training schools have improved greatly since the trial of this action.
>
> *       *       *       *       *       *
>
> The parties agree that since the trial of this cause the defendants have proceeded in good faith to improve the TYC facilities and to protect the rights of plaintiffs, and therefore the parties have jointly agreed that the following Settlement Agreement is in the best interests of the parties.

Agreement, Parts IB and ID, p. 341.

No reason to doubt the present good faith of the current personnel of the TYC, or their counsel, or plaintiffs' counsel is apparent. However, legal instruments are executed precisely because good faith and social mores are often insufficient to insure that promises are kept, and to make certain that the precise contours of given promises are fully understood by the promisors and the promisees. The trust accorded the current state defendants on the basis of their present good faith must be tempered, nonetheless, by the recognition that personnel will inevitably change, and that, just over a decade ago, many of the individuals who then comprised the officialdom of TYC, and at least one of the attorneys who represents them, unregenerately and callously endeavored to preserve and perpetuate debased, execrable institutions in which juveniles were tortured and terrorized. *See Morales,* 383 F.Supp. 53. Further, few or none of the asserted reforms regarding the conditions of confinement affecting the class were placed in operation before the orders of this court.

Among the specific weaknesses and defects perceived in the language describing the Committee of Consultants ("The Committee") and its powers are these:

*Fault 1:*

> The Committee will perform its obligations by means of personal inspections of relevant Agency operations. Inspections of each TYC facility ... will be performed once annually (except as more frequent inspections may be provided hereinafter).... The time and schedule of inspections shall be jointly agreed by the Committee and the Agency in order to assure the full and adequate inspections contemplated by this Agreement and without duly interfering with Agency programs.

Agreement, Part IVC, p. 341. This paragraph insures that the annual inspection will be announced well in advance, and thus, that a devious defendant would have time to script and rehearse misleading pre-

---

**2.** The Agreement provides that the Committee of Consultants will be established as a joint venture. Agreement, Part IVS, p. 9. The parties have tendered a proposed instrument entitled "Morales Consultant Committee Joint Venture Agreement," which would accomplish that goal. *See* Agreement, Exhibit I.

sentations for the Committee's mollification.

*Fault 2.*

In addition to the annual inspections, the Committee may perform follow-up inspections either with the agreement of the Executive Director [of TYC] or upon the following conditions:

(1) to observe Agency action in response to problems identified by the Committee (*and* acknowledged to be problems by the Executive Director); *and*

(2) after consultation by the Committee with the Executive Director concerning whether solutions to a problem have been put in place and whether additional inspections would be useful to the Agency, if, after such consultation, a majority of the Committee votes to perform a follow-up inspection. [Emphasis added.]

Agreement, Part IVC, p. 342. Therefore, if the defendant Executive Director refuses to consent to follow-up inspections and refuses to "acknowledge" that a problem exists, he can readily debar all follow-up inspections to the annual announced visit. There is no explicit language in this provision, as there is in other provisions of the Agreement, dictating that the Executive Director "shall not unreasonably withhold" either his agreement to an inspection or his "acknowledgement" that a problem exists.

*Fault 3.*

Committee members are authorized to talk with staff members in private . . . during visits to TYC facilities.

Agreement, Part IVE, p. 342. There is no requirement, however, that staff personnel answer Committee members' questions.[3]

*Fault 4.*

The Committee is authorized to make unannounced visits to Agency programs with the knowledge *and* consent of the relevant Central Office administrator of the Agency who shall not disclose the pendency of such visits to such programs. [Emphasis added.]

Agreement, Part IVF, p. 342. This language provides that unannounced inspections are proscribed unless the defendants' relevant Central Office administrator gives his "consent." Again, there is no provision requiring that this consent shall not be unreasonably withheld. Alternatively, a recalcitrant and deceitful defendant could withhold consent to an "unannounced visit" until an intolerable situation was ephemerally or ostensibly ameliorated, at which time consent could be granted, all without disclosing "the pendency of such visits to such programs." The gist of this provision is that "unannounced visits" must be announced.

*Fault 5.*

The Committee is authorized to utilize consultants to assist it in performing its obligations herein. Such consultants shall be subject to approval of the Executive Director, which approval shall not be unreasonably withheld.

Agreement, Part IVJ, p. 342. Thus, a consultant selected by a majority of the three Committee members, all three of whom have already been approved by the Executive Director, *see* Parts IVB and IVM, must himself also be specifically approved by the defendant Executive Director.

*Fault 6.*

The Committee shall, by a majority vote of its remaining members or member, replace any member who ceases to serve on the Committee, subject to approval of the new member of the Executive Director, which approval shall not be unreasonably withheld.

Agreement, Part IVM, p. 342, and Exhibit 1, Section 5.1, p. 343. It must be acknowledged that if one of the committee of three leaves, there will be no such thing as a "majority vote." Consequently, if the current era of good feeling should draw to a

---

**3.** In the on-going litigation before this judge challenging the conditions and procedures of the institutions operated by the Texas Department of Corrections, styled *Ruiz v. Estelle,* No. H–78–987–CA, staff members have refused, with the approval of defendant Director Estelle, to speak to monitors from the Special Master's office.

close, a Committee member's departure could bequeath a polarized Committee of two, deadlocked as to choosing a successor (the tie-breaker) and, as a result, as to all other decisions.[4]

Moreover, even if the designation of a successor should proceed without discord, the successor's appointment is conditioned upon the approval of the defendant Executive Director of TYC. Thus, while the original members of that Committee, listed in Part IVB, have obviously been approved by *both* parties, their successors need only be approved by the defendants.

*Fault 7.*

The term of the Committee shall be four consecutive years beginning not later than September 1, 1983.... The Committee will make recommendations to the Agency concerning the continuation of its operations after the conclusion of the four year period; however, any such continuation of the Committee shall be within the sole discretion of the Agency. Notwithstanding any other provision herein to the contrary, in the event that the Committee initiates, defends, or otherwise participates in litigation regarding the enforcement or interpretation of this Settlement Agreement, the Committee shall continue in existence during the pendency of such litigation, and the term of the Committee shall thereafter be extended so that the Committee will have been enabled to conduct its work, without participation in such litigation, for a cumulative total of four years. However, in the event that the court before which the litigation is prosecuted finds and determines that the matter in controversy in such litigation has not interfered with the Committee's performance of its duties or responsibilities under this Settlement Agreement, the term of the Committee shall not be extended, but rather shall

proceed as if the litigation had not occurred.

Agreement Part IVQ, p. 343.

The last two sentences are inserted to appease this court. Under the original agreement, if enforcement litigation became necessary, the Committee's tenure might well have expired before such litigation could have come to fruition.[5] The significance of the amendment may be undermined, however, by the following language.

The budget for the Committee's operations shall be Sixty Thousand Dollars ($60,000.00) per year, which shall cover all costs incurred in connection with its activities, including but not limited to fees, expenses, overhead, administrative costs, travel, and consultants.... The Agency shall provide or secure funding for the Committee in the total amount of Two Hundred Forty Thousand Dollars ($240,-000.00) payable in four equal installments of Sixty Thousand Dollars ($60,000.00) each on or about September 1, 1983, September 1, 1984, September 1, 1985, and September 1, 1986.... In no event shall any extension of the Committee's term pursuant to paragraph Q above increase the Agency's funding obligation set out herein.

Agreement, Part IVR, pp. 343–344. Apparently, then, even if the Committee's four-year term has to be extended, pursuant to Paragraph IVQ, the Committee will receive no additional funding. The good-faith theory behind this provision seems to rest upon the precarious assumption that, if litigation interferes with the performance of the Committee's duties and responsibilities, the Committee will be saving a corresponding portion of the $60,000.00 annually provided to it. This entails a suspension of disbelief, since litigation might well interfere with some of the Committee's func-

---

4. The original proposed agreement had provided that no Committee funds could be expended except upon unanimous vote of the Committee. This provision, because it invited deadlock and Committee impotence, was one of the three this court specifically faulted in disapproving that settlement agreement on April 15, 1983. The Amended Settlement authorizes Commit-

tee expenditures upon a majority vote. Agreement, Part IVR, p. 343, and Exhibit 1, § 4.1, p. 341.

5. This was the second reason for this court's April 15, 1983, disapproval of the original proposed settlement agreement.

tions, but not others, and the Committee might easily exhaust its meager budget upon those responsibilities defendant has allowed it to pursue, leaving no funds to execute those functions defendant has resisted.

Second, and regardless of whether enforcement litigation becomes necessary, the $60,000.00 annual budget is a niggardly sum to accomplish its many contemplated purposes, and shortage of funds may in and of itself pretermit meaningful monitoring of TYC. Upon this budget the three members of the Committee, together with such expert consultants and staff as they can afford, will attempt to visit "each TYC facility, *i.e.,* training school, reception center, half-way house, etc." and such TYC contract facilities "as they may determine to be feasible and appropriate," Agreement, Part IVC, Page 342, in order to determine—after reviewing files, rules, and procedures manuals, and after interviewing staff and students—whether TYC is meeting its substantive commitments under the Agreement in such areas as rulemaking; use of "isolation" and "security"; access to counsel and courts; visitation, mail and telephone rights; grievance procedures; use of volunteers; parole release policy; transfer policy; reclassification policy; parole revocation policy; use of mace and tear gas; employment of a Chief of Educational Services; counselling programs; least restrictive placement policy; vocational education; student forced labor policy; employment of a Recreation Supervisor; employment of a Child Care staff; qualifications of psychiatrists and psychologists; program coordination; health standards; intake procedures; student physical assessment; student educational and psychological assessment; development of individual program plans; employee screening; employee training requirements; use of psychotropic drugs; de-

velopment and implementation of a program and outcome evaluation; living arrangements policies; and others.[6]

### Applicable Legal Standards

In order to approve a proposed settlement of a class action, pursuant to Fed. R.Civ.P. 23(e), a district court must be satisfied that the settlement is "fair, adequate, and reasonable." *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982); *In re Corrugated Container,* 643 F.2d 195, 207 (5th Cir. 1981); *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). The burden is upon the proponents of the settlement to persuade the court that it is fair, reasonable, and adequate. 3B Moore's Federal Practice ¶ 23.80[4] at 23–520 (1982).

Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members. *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975), *cert. denied* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1974).

A court's first duty under Rule 23(e) is to determine "whether the settlement was a product of fraud or collusion." *Parker,* 667 F.2d at 1209. In this case, there is no evidence of fraud or collusion. However, in any protracted large-scale injunctive litigation of this kind, the plaintiffs' attorneys embark upon an enormous commitment of time and labor, and the lengthy postponement of payment (over a decade in this instance) may severely tax the financial vitality of a law firm, and unwittingly color the judgment of otherwise circumspect counsel. Under those circumstances, robust representation may flag. Consequently, the court's assiduousness under Rule 23(e) is an important safeguard of the rights of absent class members.

---

**6.** Before the Committee even begins its own operations, it will be obliged to *reimburse* TYC for the costs of an "orientation." *See* Agreement, part IVP, p. 342.

An attorney's fee provision embodying the principles of 42 U.S.C. § 1988 has been written into the Agreement, at the insistence of this court, for the benefit of plaintiffs' or the Com-

mittee. Should enforcement litigation become necessary, the Committee's $60,000 budget will not be depleted by such fees. Agreement, Part VIB, p. 353. The absence of such a provision was the third reason for the court's April 15, 1983, disapproval of the original proposed settlement agreement.

■ This court's dissatisfaction with the proposed settlement, already articulated and detailed, may be reduced to the general apprehension that, even assuming good faith, the agreement is relatively weak, and that, absent good faith, its benefits are illusory. "The charge that the benefits of the settlement are illusory calls into question the overall adequacy of the settlement". *Grunin,* 513 F.2d at 124. However, a settlement "can be inadequate only in light of the strength of the case presented by the plaintiffs." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2nd Cir.1974); *Parker,* 667 F.2d at 1209. "[A]bsent fraud or collusion, the most important factor is the probability of the plaintiff's success on the merits." *Parker,* 667 F.2d at 1209. In other words, it may well be, that the weaknesses in the negotiated settlement that have already been observed reflect plaintiffs' counsel's judgment that conditions in the TYC institutions have so improved, that little injunctive relief is attainable at this time, and that, currently, success on the merits is unlikely. There has been discovery sufficiently extensive to qualify plaintiffs' counsel to make such a judgment. *See Parker,* 667 F.2d at 1209. Nevertheless, none of that discovery has been introduced into evidence, no testimony has been offered in open court, and, at present, this court simply has no independent basis for evaluating plaintiffs' counsel's judgment. Further, no discovery has been accomplished since 1981. On the one hand,

> in examining a proposed compromise ... the court does not try the case. The very purpose of the compromise is to avoid the delay and expense of such a trial.

*Parker,* 667 F.2d at 1209. On the other hand,

> [t]he court must have sufficient information to permit it to arrive at an "intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated."

3B Moore's Federal Practice ¶ 23.80[4] at 23–523 (1982).

> Unless the court can make appropriate independent factual findings of fairness

> on the record before it, a plan should not be approved.

Manual For Complex Litigation § 1.46, published in 1 (Part 2) in Moore's Federal Practice at 78 (1982).

■ In order to achieve an independent perspective on the adequacy of the proposed settlement, it will thus be necessary for the court to appoint an expert in the field of juvenile corrections and the implementation of consent decrees, and to permit such court-appointed expert to engage in an independent fact-finding inspection of TYC's facilities and to prepare a report upon her findings. *See* Manual For Complex Litigation § 1.46, *supra,* at 69. *See* F.R.E. 706. It may become necessary to invest the expert with some of the powers provided by Fed.R.Civ.P. 53, in order that she may properly conduct her inspection. It has been recognized that such court-appointed experts can be of "invaluable assistance" in creating a record from which a court can make an independent evaluation of a proposed settlement agreement. Manual For Complex Litigation, *supra,* at 69.

### Conclusions

The parties have apparently made a good faith attempt to settle this case. There is much that is laudatory in the substantive provisions of the Agreement. What has been said of settlements in school desegregation cases is entirely applicable to all institutional reform litigation:

> [V]oluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any ... remedy.

*Armstrong v. Board of School Directors of the City of Milwaukee,* 616 F.2d 305, 318 (7th Cir.1980).

■ Before this court can approve the proposed settlement, however, the following steps must be taken:

(1) The court must hear testimony or consider written evidence sufficient to justify an independent conclusion that conditions have so improved at TYC that sub-

stantial injunctive relief is no longer a likely product of a trial on the merits. In particular, the court desires to hear the testimony or review the written reports of the plaintiffs' "experts in the fields of corrections, medical care, and education," who inspected TYC facilities between August and November 1981. Agreement, Part IA, p. 342.

(2) The court-appointed expert must inspect TYC facilities, prepare a report, and testify, in open court, upon her factual findings.

(3) Approval of the Agreement and dismissal of this case must be conditioned upon the parties' stipulation to the following interpretation of that Agreement:

> If for any reason it becomes impossible for the Committee meaningfully to monitor or enforce the substantive provisions of the Agreement, that the Agreement will be deemed to have been repudiated, and this court will entertain a motion to vacate its prior dismissal order and to reinstate the case upon its trial docket, pursuant to Fed.R.Civ.P. 60(b)(6).

See, e.g., Fairfax Countrywide Citizens Association v. Fairfax County, 571 F.2d 1299, 1302–1303 (4th Cir.1978); Aro Corp. v. Allied Witan Company, 531 F.2d 1368 (6th Cir.), cert. denied 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976).

(4) The defendants must agree to defend, indemnify and hold harmless, the members of the Committee of Consultants created by this Agreement from and against any and all damages, losses, and expenses (including, without limiting the generality of the foregoing, attorneys' fees), arising from or growing out of any claims brought or actions filed against them for their official acts [7] in either state or federal courts, and regardless of whether such claims or actions are groundless or lack merit.

In accordance with the foregoing analysis, it is

ORDERED that:

(1) The parties show cause, if any they have, why Linda R. Singer, Esq., should not be appointed as an expert in the field of juvenile corrections, for the purpose of studying and reporting upon the existing conditions throughout the TYC system relevant to any aspect of the proposed settlement agreement. (See Exhibit 2, attached hereto, Curriculum Vitae of Linda R. Singer.)

(2) A hearing shall be held on the court's order to show cause on July 11, 1983, at 1:30 p.m., in Room 306, Federal Building, 211 West Ferguson, Tyler, Texas, at which the proposed court-appointed expert shall be present.

### EXHIBIT 1
### AMENDED SETTLEMENT AGREEMENT

This Amended Settlement Agreement (hereinafter "Settlement Agreement") is entered into by and on behalf of the parties in this class action lawsuit subject to the

---

**7.** Special masters in prison reform cases have been subjected to such suits. Chief Judge Alaimo, of the Southern District of Georgia, has informed this court that the special master appointed in Guthrie v. Evans, Civ. No. 3068 (S.D.Ga.) (Alaimo, J.), for instance, currently faces four such suits. Brown v. Evans, CV 482–563; Durrence v. Evans, CV 482–564; Wells v. Evans, CV 482–565; Lundell v. Evans, CV 482–566 (S.D.Ga.) (Alaimo, J.). While a special master would seem to be entitled to absolute judicial immunity, see, e.g., Smallwood v. United States, 358 F.Supp. 398, 404 (E.D.Mo.) aff'd, 486 F.2d 1407 (8th Cir.1973) (referees and trustees in bankruptcy); Ashbrook v. Hoffman, 617 F.2d 474, 476–77 (7th Cir.1980) (court-appointed partition commissioners); Kermit Construction Corp. v. Banco Credito Y Ahorro Ponceno, 547 F.2d 1 (1st Cir.1976) (court-appointed receiver); Bradford Audio Corp. v. Pious, 392 F.2d 67, 72–73 (2d Cir.1968) (receiver); Mosher v. Saalfeld, 589 F.2d 438, 442 (9th Cir.1978) (per curiam), cert. denied, 442 U.S. 941, 99 S.Ct. 2883, 61 L.Ed.2d 311 (1979) (court-appointed conservator of estate), it is less certain precisely what degree of immunity these monitors would be entitled to. On the one hand, they would not be extensions of this court. On the other hand, they would perform functions closely analogous, if not identical, to those of many special masters, and they would be empowered only by an agreement specifically approved by this court, pursuant to Rule 23(e). Under the circumstances, it is advisable that the parties protect their creations with immunity from frivolous proceedings, to which they may readily be subject.

approval of the United States District Court, Eastern District of Texas. This action was filed in 1971, and after a lengthy trial involving evidence on all aspects of the operations of the Texas Youth Council (hereafter "TYC"), a preliminary injunction was issued on August 31, 1973, in which the Court ordered that certain practices of the TYC be abolished pending a final order of the Court. 364 F.Supp. 166 (E.D.Tex.1973). The preliminary injunction dealt with the use of physical force, corporal punishment, the conditions of segregation and solitary confinement, visitation, mail, and internal due process requirements.

Thereafter, on August 30, 1974 the Court issued its Memorandum Opinion which required the parties to submit a plan to the Court "for accomplishing a network of facilities for the treatment of delinquent youth that (was) consistent with (the Court's) opinion." 383 F.Supp. 53, 126 (E.D. Tex.1974).

Before a plan could be devised and presented to the Court, defendants appealed from the 1974 decision, asserting among other claims that the matter should have been heard before a three-judge District Court. Ultimately, the Supreme Court rejected this theory, per curiam, in an opinion which did not address the substance of the District Court's 1974 opinion. 430 U.S. 322 (1977).

The Court of Appeals, on remand, considered defendants' claim that they had instituted substantial programmatic changes in their facilities since the trial of this cause, and the Court of Appeals thereupon ordered the matter remanded to this Court for evidentiary hearings to determine the extent to which injunctive relief might still be appropriate. 562 F.2d 993 (5th Cir.1977). While the Court of Appeals expressly declined to "decide the legal issues presented," the Court expressed doubt whether a "right to treatment" existed as a basis for the specific requirements of this Court's 1974 decision.

After the remand, the parties presented, and this Court ruled upon, several formal discovery requests. However, on August 21, 1981, the parties and amici filed a Joint Status Report informing the Court that they had agreed to suspend formal discovery pending the completion of informal discovery by plaintiffs, amici, and their experts and pending a series of meetings in an effort to negotiate a settlement of all outstanding issues in the case without the necessity of further evidentiary hearings before the Court. Informal discovery and settlement negotiations having now been completed,

It is stipulated and agreed by and between the parties as follows:

1. *Agreed Facts and Conclusions of Parties*

A. Since the 1977 remand, the parties have undertaken extensive discovery on the merits, formal and informal. During the summer of 1978, pursuant to agreement of the parties, counsel for plaintiffs, defendants, and amici toured TYC facilities. In conjunction with the inspections, defendants submitted an information packet containing an overview of the changes which had occurred since trial. (See Materials Compiled for Meeting of Counsel, August 14, 1978.) Plaintiffs and amici submitted their first set of over one hundred interrogatories regarding the merits on October 15, 1979, which also according to agreement of the parties, were answered by defendants and filed December 26, 1979.

Plaintiffs and amici served a second set of interrogatories in February 1981; this set contained over five hundred questions seeking detailed information regarding the full range of TYC activities. Pursuant to agreement of counsel, defendants submitted an eleven-volume information packet in lieu of answers to those interrogatories. (See Information Furnished in Anticipation of Settlement, October 7, 1981.) The information and the exhibits were keyed to general areas which were expected to be the subjects of settlement negotiations.

In addition, between August and November, 1981, counsel for plaintiffs, the United States, and their experts in the fields of corrections, medical care, and education

conducted inspections of TYC facilities accompanied by counsel for defendants. The participants visited each training school at least once, a halfway house and a contract placement facility. They reviewed TYC rules and procedures generally, inspected files of numerous individual plaintiffs, and interviewed students and staff at the facilities. All discovery was undertaken with the full cooperation and assistance of defendants.

B. The parties agree that conditions and the programs in the TYC training schools have improved greatly since the trial of this action.

C. The parties expressly agree that this Agreement does not constitute an admission by defendants of any violations of constitutional or statutory rights held by the plaintiffs. The parties have entered into this Agreement as a means to put a reasonable end to the controversy as well as to avoid the considerable cost and time which further litigation would involve for all of the parties. Neither this Agreement nor the Judgment that may follow from this Agreement, nor anything contained herein or therein, shall constitute or be construed as evidence or an admission with respect to any matter alleged or arising out of the complaint, or its amendments, or of any wrongdoing or misconduct on the part of the defendants, or any of them, or any of their employees, representatives or agents.

D. The parties agree that since the trial of this cause the defendants have proceeded in good faith to improve the TYC facilities and to protect the rights of plaintiffs, and therefore the parties have jointly agreed that the following Settlement Agreement is in the best interests of the parties.

II. *Definitions*

A. *Lawsuit:* The case of *Morales v. Turman,* filed in 1971 in the U.S. District Court for the Eastern District of Texas, Civil No. 1948.

B. *Plaintiffs:* The class of juveniles under the jurisdiction of the Texas Youth Council, as certified by the Court, herein also referred to as "juveniles" or "students."

C. *Defendants:* The named party defendants in the lawsuit, their agents and employees, and their successors in office.

D. *Parties:* Plaintiffs and defendants.

E. *Agency:* The Texas Youth Council, recently renamed Texas Youth Commission (hereinafter also referred to as "TYC"), its agents and employees.

F. *Committee:* The Committee of Consultants appointed by the parties pursuant to this Agreement.

G. *Board:* The Texas Youth Council Board, which membership is appointed by the Governor of the State of Texas pursuant to Section 61.012, Human Resources Code, V.T.C.A.

H. *Executive Director:* The Executive Director of the Texas Youth Council appointed by the Texas Youth Council pursuant to Section 61.017 with the powers and duties delegated in Section 61.019, Human Resources Code, V.T.C.A.

I. *Central Office:* The administrative headquarters of the Texas Youth Council consisting of the offices of executive and key administrative personnel with general supervisory responsibility for the operation of the Texas Youth Council's programs and facilities.

J. *TYC Facilities:* Any TYC operated institution, halfway house, or other facility at which the Agency places juveniles who are adjudicated delinquent by an appropriate state court and committed to the custody of TYC.

III. *Effective Date of Agreement*

This Agreement shall become effective upon approval in full by the Court pursuant to the provisions of Rule 23(e), Federal Rules of Civil Procedure, and the dismissal of this lawsuit pursuant to the provisions herein.

IV. *The Committee*

A. The parties agree that there will be constituted a Committee of Consultants to review the compliance of the Agency with the terms of this Settlement Agreement, to review compliance with the TYC's own rules, regulations, policies, and procedures, to report the results of such reviews to the Agency's Executive Director, and to recommend to the Agency answers and solutions to issues and problems which are referred to the Committee either by the terms of this Settlement Agreement or by the Executive Director in the future. In making its recommendations the Committee may make reference where appropriate to applicable national standards.

B. The members of the Committee are Allen F. Breed, Milton F. Shore, and Frank Garfunkel.

C. The Committee will perform its obligations by means of personal inspections of relevant Agency operations. Inspections of each TYC facility, i.e. training school, reception center, halfway house, etc., will be performed once annually (except as more frequent inspections may be provided for hereinafter), and each inspection shall be long enough for the Committee members to adequately inspect the relevant operations. Inspections of contract facilities and other programs of the TYC may be made from time to time as the Committee may determine to be feasible and appropriate. The time and schedule of inspections shall be jointly agreed by the Committee and the Agency in order to assure the full and adequate inspections contemplated by this Agreement and without unduly interfering with Agency programs. This Agreement neither requires nor prevents all inspections of all facilities from occurring within a single continuous time period. In addition to the annual inspections, the Committee may perform follow-up inspections either with the agreement of the Executive Director or upon the following conditions:

(1) to observe Agency action in response to problems identified by the Committee (and acknowledged to be problems by the Executive Director); and

(2) after consultation by the Committee with the Executive Director concerning whether solutions to a problem have been put in place and whether additional inspections would be useful to the Agency, if, after such consultation, a majority of the Committee votes to perform a follow-up inspection.

D. The Committee is authorized to request personal meetings with Agency administrators, including the Executive Director, which requests will not be unreasonably denied. All requests for personal meetings with Agency administrators shall be made to the Executive Director.

E. Committee members are authorized to talk with staff members in private and with students in private during visits to TYC facilities.

F. The Committee is authorized to make unannounced visits to Agency programs with the knowledge and consent of the relevant Central Office administrator of the Agency who shall not disclose the pendency of such visits to such programs.

G. Committee members shall have access to all relevant records and files without limitation.

H. The Agency will designate an employee as a liaison person to whom requests for information will be made by Committee members. The Agency will comply with reasonable information requests.

I. The Agency will provide the Committee with a complete set of the Agency's Official Rules, General Operating Policies and Procedures, Manuals, updates to the foregoing, and Agency newsletters.

J. The Committee is authorized to utilize consultants to assist it in performing its obligations herein. Such consultants shall be subject to the approval of the Executive Director, which approval shall not be unreasonably withheld.

K. The Committee and all persons employed by or associated with it will abide by all confidentiality requirements imposed by law. Furthermore, any information received by Committee members in connec-

tion with their duties which is not otherwise available to the public shall not be published by Committee members during their tenure on the Committee except as may be specifically authorized by this Agreement or by the Executive Director.

L. The Committee is empowered to enforce this Settlement Agreement as provided in Part VI below.

M. The Committee shall, by majority vote of its remaining members or member, replace any member who ceases to serve on the Committee, subject to approval of the new member by the Executive Director, which approval shall not be unreasonably withheld.

N. The Committee may conduct its business in any manner not inconsistent with this Settlement Agreement, as it may decide from time to time.

O. Within thirty (30) days of completion of an inspection or inspections, the Committee shall report its findings and recommendations to the Executive Director in writing. The Executive Director shall deliver a copy of the Committee's report to each member of the Board of the Texas Youth Council before its next meeting following receipt of the Committee's report, shall prepare a written response to the Committee's report, and shall deliver the response to the Committee within two weeks after said meeting along with any modifications thereto made by or at the behest of the TYC Board. Thereafter, the Committee may in its discretion make public all or any portion of said report and the response thereto.

P. Not later than June 1, 1983, at the convenience of the Committee and the Agency, the Agency will offer to members of the Committee an orientation regarding the TYC which will include the following: (1) the materials described in paragraph I above; (2) meetings with the Executive Director and with upper echelon Central Office staff for the purpose of orientation regarding the TYC facilities and programs; and (3) tours of selected TYC institutions and programs. The Agency will bear the costs of such orientation, but shall be reim-

bursed by the Committee out of the Committee's first year budget when received.

Q. The term of the Committee shall be four consecutive years beginning not later than September 1, 1983. If the first year of the Committee's work begins prior to September 1, 1983, it shall begin not less than three months after the orientation described in paragraph P except upon the unanimous approval of the Committee. The Committee will make recommendations to the Agency concerning the continuation of its operations after the conclusion of the four year period; however, any such continuation of the Committee shall be within the sole discretion of the Agency. Notwithstanding any other provision herein to the contrary, in the event that the Committee initiates, defends or otherwise participates in litigation regarding the enforcement or interpretation of this Settlement Agreement, the Committee shall continue in existence during the pendency of such litigation, and the term of the Committee shall thereafter be extended so that the Committee will have been enabled to conduct its work, without participation in such litigation, for a cumulative total of four years. However, in the event that the court before which the litigation is prosecuted finds and determines that the matter in controversy in such litigation has not interfered with the Committee's performance of its duties or responsibilities under this Settlement Agreement, the term of the Committee shall not be extended, but rather shall proceed as if the litigation had not occurred.

R. The budget for the Committee's operations shall be Sixty Thousand Dollars ($60,000.00) per year, which shall cover all costs incurred in connection with its activities, including but not limited to fees, expenses, overhead, administrative costs, travel, and consultants. No Agency staff or overhead expenses whatsoever will be charged to the Committee's budget. The Agency shall make no other charges to the Committee budget except upon the express approval of the Committee. All Committee expenditures shall conform with the requirements of Texas state law. No Com-

mittee funds shall be expended or encumbered except upon the majority vote of the Committee. The Agency shall provide or secure funding for the Committee in the total amount of Two Hundred Forty Thousand Dollars ($240,000) payable in four equal installments of Sixty Thousand Dollars ($60,000) each on or about September 1, 1983, September 1, 1984, September 1, 1985, and September 1, 1986. The Committee is authorized to deposit its funds in an interest bearing account and to utilize any earned interest in performing its work. Any funds received by the Committee, including unexpended interest, which are not encumbered at the end of the Committee's four year term, or at the end of any extension of its term as provided in paragraph Q above, shall be forwarded by the Committee to the Texas treasury within 60 days from the end date. In no event shall any extension of the Committee's term pursuant to paragraph Q above increase the Agency's funding obligation set out herein.

S. The Committee members shall enter into a Joint Venture Agreement in the form set out in Exhibit 1 hereto.

T. In addition to its other duties and responsibilities described in this Agreement, the Committee shall specifically review and report upon the following areas in conjunction with its work:

(1) the use of isolation and security to determine and recommend techniques that are successful in reducing their use;

(2) the use of the grievance system by students to determine the adequacy of the grievance mechanisms and the successfulness of the grievance system in dealing with legitimate student complaints;

(3) the need for and/or availability of student advocates to assist students in pursuing grievances and in receiving appropriate due process protections, and to advise students with regard to their rights;

(4) the adequacy of the parole release criteria with regard to their appropriateness and the degree to which they adequately provide notice to students of the progress they must make in order to succeed in being paroled;

(5) the adequacy of the due process protections which are provided to students in the parole revocation process;

(6) the role of the Chief of Educational Services in improving the educational programs provided by the TYC;

(7) vocational education; and

(8) the development and monitoring of the TYC program evaluation system.

U. Nothing herein shall preclude the Agency from contracting with the Committee or any of its members to perform consulting services regarding issues in addition to those described in paragraph T above.

V. *Further Agreements of the Parties*

A. *Student Handbooks: Rights of Students, Rules of Conduct, Sanctions*

The Agency will continue to review, simplify and consolidate its rules of student conduct. A student handbook or handbooks shall be prepared advising students of their rights and of the rules of conduct applicable to TYC facilities. To the maximum practicable extent, a uniform set of rules, applicable to all TYC delinquent facilities, will be prepared. Upon intake by the TYC, each student will be given a handbook setting forth the rights of students, the rules of conduct and the sanctions for misbehavior. The rules will include a ranking of behaviors and sanctions for misbehavior to the maximum practicable extent to the end that all persons in the facility understand what behavior is prohibited and what penalties may be applied for violations. If a student's behavior meets criteria for Security placement, then possible sanctions may include referral to Security. Copies of handbooks will be kept readily available to students and staff in each dormitory or cottage in which students spend the night, and in other buildings as appropriate.

All rules will be reviewed periodically to assure that they are meaningful, clear, and no more restrictive than necessary.

The Agency will identify and narrow the areas of discretionary rule-making authority for each TYC delinquent facility.

The Agency will continue to prohibit all forms of corporal punishment of students in the Agency's custody.

### B. *Isolation and Security*

Isolation refers to any physical removal of a student from the regular program or from contact with other students by confinement alone in a locked room or cubicle (except during normal sleeping hours).

Security refers to the placement of a student into a separate cottage, building wing or facility which is designed and operated for the segregation of students from the general population and for which ingress and egress are controlled exclusively by staff.

Isolation and security are serious and extreme measures which may be imposed only in the limited situations described herein. Neither isolation nor security shall be used for retribution at any time.

A student may be confined in isolation, either in his own room or in some other room or cubicle, in cases where the student is out of control and is a serious and immediate physical danger to himself or others, and only after less restrictive methods of restraint have failed. Isolation may be imposed only with the approval of the superintendent or acting superintendent. Students in isolation shall receive appropriate psychological and medical services. A student placed in isolation shall be released therefrom within three hours or shall be joined by a staff member who shall thereafter remain with the student until he or she is released from isolation. As soon as a student is sufficiently under control so as to no longer pose a serious and immediate danger to himself or others, he shall be released from isolation immediately. The use of consecutive periods of isolation to evade the spirit and purpose of this provision shall not be permitted.

A student may be confined in security where there are reasonable grounds to believe, based upon overt acts, that the student is a serious and continuing escape risk, or where the student is a serious and immediate physical danger to himself or others and staff cannot protect the student or others except by referring the student to security, or where the confinement is necessary to prevent imminent and substantial destruction of property or to restrain behavior that creates substantial disruption of the routine of the facility, or upon the student's own request. A student may be admitted to security only with the approval of the acting superintendent, the student's caseworker, or a child care professional designated by the superintendent. Students in security shall receive appropriate psychological and medical services. No student shall remain in security more than twenty-four (24) hours solely on the basis of the behavior for which he or she was admitted to security, nor shall there be any minimum length of time in security imposed, by policy or routine practice, for designated behaviors or offenses. The use of consecutive periods of security to evade the spirit and purpose of this provision shall not be permitted. The following due process protections shall be provided to students who remain in security longer than twenty-four (24) hours: the student is informed of the reasons for the continued confinement, an impartial administrator reviews the reasons for the confinement and makes a decision on the facts presented, the student is present and participates in the review and has an opportunity to make his or her own statement, the student is given assistance in presenting his or her position if the student requests such assistance, the administrator's decision is based solely on the evidence presented, a written statement of the decision setting forth the reasons for the decision is provided to the student, an appeal procedure is provided to the student, and the student is notified of the outcome of the appeal.

Students placed in isolation or security shall be visually checked at least every fifteen (15) minutes and visited at least once each day by the acting superintendent and by personnel from clinical, social work and

medical units. A permanent log shall be maintained stating the name of the person who authorized isolation or security confinement, the acting superintendent's daily approval of the placement, the names and times of the persons who visited the student while so confined, and the date and time of the student's placement into isolation or security and release therefrom. Reports on the use of isolation and security at each institution or facility shall be monitored on a regular basis to determine whether there is disproportionate use of isolation or security at certain institutions or facilities. If unjustified disproportionate use is determined, remedial efforts shall be undertaken immediately to correct the disparity.

Students in security shall receive the same food, prepared in the same manner, as other students, except as special diets may be prescribed on an individual basis by medical personnel.

The Agency shall examine the use of isolation and security at each institution to determine what techniques are successful in reducing their use.

### C. *Access to Counsel and Courts*

The handbooks of student rights and rules (Part V(A), above) shall clearly inform students of their right to write or telephone at their own cost, without censorship, to any court or any attorney of their choice at any reasonable time. The handbook shall also clearly inform students that they may consult an attorney and may have a legal remedy if a grievance is resolved against them or if they are transferred to a more restrictive program. There shall be no restriction on the visitation of attorneys to students at institutions or facilities during regular business hours.

### D. *Visitation, Mail, and Telephones*

The Agency's policies on visitation, mail, and telephones shall be uniform as far as practicable, and shall be incorporated into the handbook of rights and rules. Liberal visitation, mail and telephone policies shall be maintained to encourage contact between students and their families. Stu-dents may write to and receive letters from anyone they wish, and they shall be provided with writing materials and postage subject to reasonable restrictions. There shall be no censorship of mail or telephone calls, but reasonable time, place and manner restrictions may be imposed upon telephone use by students. However, nothing herein shall preclude the Agency from enforcing reasonable regulations regarding contraband. When funds are available for that purpose, the Agency should establish procedures to assist students and their families for whom the financial expense of telephone calls and visits unduly limits or precludes regular contact.

### E. *Grievances*

A clear description of the grievance process shall be included in the student rights and rules handbook. Grievances which are appealed by the student beyond the institution or facility in which the student resides should be reviewed by the Executive Director of the Agency or his designee.

The grievance process shall make provision for, but shall not be limited to, the following:

(a) priority handling of emergency grievances;

(b) reasonable time limits at all levels of the grievance process;

(c) reasonable access to the grievance system by all students at all times;

(d) safeguards against reprisals;

(e) staff and student participation in the operation of the process;

(f) written responses, with reasons, to all grievances; and

(g) the right to appeal.

### F. *Volunteer Program*

The Agency shall take steps to expand the use of volunteers in TYC institutions and facilities. Volunteers shall be utilized to expand students' opportunities for educational and recreational experiences, to provide students with increased social interactions and to assist students, as appropriate,

in successfully completing the treatment program.

### G. *Release on Parole*

The Agency shall draft objective criteria for parole release. These criteria shall be specific enough to permit consistent application to individual cases. The criteria shall be included in the student rights and rules handbooks.

### H. *Transfers*

Objective criteria shall be established and maintained to govern the Agency's consideration of a student's transfer (other than parole revocation and initial placements from the Reception Center) to any facility which is more restrictive than the student's present facility. These criteria shall be specific enough to permit consistent application to individual cases.

If the Agency's reasons for the transfer include the commission of a violent offense by the student, or if the Agency contemplates a transfer to a facility exclusively for violent offenders for any reason, the process shall be governed by the provisions of Section I, below.

In other circumstances, the student shall be provided a hearing in all cases in which he or she requests a hearing and in all cases in which the transfer is to a more restrictive program. Before the hearing, the student shall be informed in writing of the reasons (in terms of the objective criteria) for the transfer, shall be informed whether the transfer will lengthen the student's period of confinement, and shall be informed of all of his or her rights, which are as follows:

(a) the student has the right to be present, with someone to assist him or her, at a hearing before an impartial decision maker, where he or she will have the right to introduce evidence and make his or her own statement;

(b) the hearing shall be held before the transfer, unless good cause compels a prehearing transfer, in which case the hearing shall be held within three consecutive days after the transfer;

(c) the decision maker shall decide, solely on the evidence presented, whether the Agency's transfer criteria have been met. The decision shall be in writing, shall recite the evidence relied on, and shall include conclusions which relate to the criteria;

(d) the student shall have the right to appeal the decision maker's decision, and shall be notified of this right by the decision maker.

The transfer criteria, and a description of the student's rights in the transfer process, shall be included in the student handbook.

### I. *Reclassification*

No student shall be reclassified as a violent offender unless the following protections are provided:

(a) the right to be represented by counsel;

(b) a hearing is provided before a neutral hearing examiner who is a law school graduate;

(c) the student and his or her attorney are provided with formal written charges of a violent offense, a list of the witnesses, and copies of all other materials to be submitted to the hearing examiner;

(d) there shall be a bifurcated hearing. In the adjudication phase, unless the examiner determines by a preponderance of the evidence admissible in non-jury civil cases that the student committed a violent offense, reclassification shall be denied. A student's oral statement shall not be admissible to prove guilt unless it resulted in the discovery of fruits or instrumentalities of the charged offense. A voluntary written statement, signed by the student after being advised of his or her rights and of the possible uses of his or her statement, may be admitted to prove guilt. No information about a student's personal or social history, including information in his or her TYC records, may be disclosed to the examiner prior to the conclusion of the adjudicatory phase.

(e) the student has the right to subpoena witnesses and to compel production of documents at any pre-hearing depositions and at the hearing, to take pre-hearing depositions, to confront and cross-examine adverse witnesses, and to the privilege against self-incrimination. No adverse inferences may be drawn from his or her failure to testify.

(f) if the offense charged, or a lesser included offense which is itself a violent offense, is found to have been committed, a disposition hearing shall be held to determine whether there are mitigating circumstances. If the hearing examiner finds substantial mitigating circumstances, reclassification shall be denied.

### J. Parole Revocation

Parolees will not be detained pending a parole revocation hearing except upon the approval of an Agency employee, who is not the parolee's parole officer, that such detention is necessary and appropriate. The parolee shall be released unless there is probable cause to believe (1) that he or she committed a criminal act or otherwise violated the terms of his or her parole, and (2) that one or more of the Agency's detention criteria are met. Parolees who are detained shall receive a full parole revocation hearing within eleven (11) days of being detained with due process protections not less than those provided for students at reclassification hearings. If the parole revocation hearing is not held within eleven (11) days, and time is not waived by the student after being advised by an attorney, the student shall receive a detention hearing conducted by an impartial decision maker at which the student shall have the right to be represented by counsel.

Criteria for detention and revocation along with a description of the parole revocation process shall be included in handbooks or information which are given to students when they are paroled.

### K. Mace and Tear Gas

The Agency shall continue to prohibit the use of mace. Tear gas or any other chemical crowd control substance may be used only to the extent reasonably necessary to bring under control a riot that threatens imminent harm to human life or imminent and substantial destruction of property.

### L. Chief of Educational Services

The Agency shall employ a Chief of Educational Services responsible to the Assistant Director for Childcare. The duties of the Chief of Educational Services shall be to develop education programs and curricula, including academic, special, bilingual, and vocational, and to supervise and evaluate the professional work of principals and teachers employed at TYC facilities.

### M. Counseling

The Agency shall ensure that all TYC students receive counseling regarding their academic and vocational progress, release planning and career planning. Such counseling shall be provided by qualified staff members who are knowledgeable about TYC academic and vocational programs, career options for TYC students, and the parole process. Such counseling shall be provided initially in conjunction with the development of each student's treatment plan and shall periodically be provided thereafter in conjunction with reviews of each student's progress.

### N. Placements

Policies and procedures shall be written with the goal of placing students in accordance with the least restrictive appropriate placement available to the Agency. Among the factors the Agency shall take into account in determining an appropriate placement is the student's assessed needs. If the Agency finds that placement of students in the least restrictive appropriate placement is hampered by a lack of access to a sufficiently broad range of placement alternatives, the Agency shall continue to take steps to increase the range of placement alternatives available to the Agency for student placements. Nothing herein shall be construed to limit placement by the Agency of a student in a wilderness experience program or other innovative program

wherever located, nor to limit placement of violent offenders.

The Agency shall continue to take steps to develop and implement sufficient non-institutional community placement alternatives.

### O. *Vocational Education*

The Agency shall provide a career development curriculum which (1) emphasizes occupations in which there are existing or potential job opportunities and provides students with knowledge and, where feasible, skills regarding them, (2) is designed to assist students to become aware of the values and attitudes necessary for career success, (3) provides "world of work" experiences where appropriate and feasible, (4) allows students to explore careers in which they have an interest, and (5) to the maximum feasible extent provides real work experiences for appropriate students. A career development component shall be included in each student's individual education plan which component shall include all or a portion of the career development curriculum.

The Agency shall periodically seek technical assistance from such agencies as the Texas Education Agency, the Texas Advisory Commission for Technical and Vocational Education and the Texas State Technical Institute in the continued development, improvement and expansion of vocational and career education programs.

### P. *Student Work*

Students in TYC facilities shall not be required to perform work of any kind (other than academic school work) unless (1) the work is reasonably related to the student's housekeeping or personal hygienic needs and is equitably shared by the other students in that program or facility, (2) the work is part of an approved vocationally oriented program for the student, (3) the work is in furtherance of the maintenance of the facility and is in lieu of restitution for property damage committed by the student or is routine clean-up which is equitably shared by all of the students, (4) the

student volunteered for the work assignment, or (5) the student is being compensated for the work assignment.

### Q. *Recreation Supervisor*

The Agency shall employ a full time Recreation Supervisor at each training school. The Recreation Supervisor shall plan and implement a comprehensive recreation program to include activities such as sports, games, dances, music, drama, art, camping, and field trips, to occupy students during non-school waking hours and especially on weekends.

### R. *Childcare Staff*

Casework, recreation and other direct childcare staff shall be employed by the Agency and assigned to programs in sufficient numbers to provide adequate direction and supervision of students, especially during after-school and evening hours and on weekends and holidays in order to achieve the following goals: (1) to preclude inappropriate restrictions on student activities which are imposed solely for purposes of control; (2) to encourage and allow for a range of recreational, leisure, counseling and treatment activities appropriate for the needs of students; and (3) to allow sufficient opportunities for staff-student interactions on a personal level thereby permitting staff and students to interact in relatively unstructured contexts.

The degree to which the ratio of casework, recreation and other direct childcare staff to students approaches one to eight for at least one full work shift per day during after-school and evening hours and on weekends and holidays shall be considered as evidence of the success of the Agency in meeting these goals.

### S. *Psychiatrists and Psychologists*

Psychiatrists hired to work with the training schools should have at least one year of postgraduate training or equivalent experience in child and adolescent psychiatry and shall have substantial community clinical experience. The primary duty of

the psychiatrists shall be to act as teachers, evaluators, and resources for the direct treatment staff. Psychiatrists employed by the Agency shall be encouraged to pursue continuing education in child and adolescent psychiatry where feasible.

Psychologists employed by the Agency shall be involved in the psychological assessments of students. Psychologists employed at TYC facilities shall assist in the management of student care, counseling and group treatment programs, and shall be available to provide psychological consultation regarding students with caseworkers and other childcare staff. Psychologists shall, to the maximum feasible extent, have substantial experience and demonstrated interest in working with adolescents.

### T. *Program Coordination*

The Agency shall assure that the treatment and cottage life programs are coordinated and integrated with the education program (under the direction of the Principal) and the recreation program (under the direction of the Recreation Supervisor).

The Agency shall integrate the houseparent youth activities supervisor and caseworker staff at each institution and shall establish a single line of authority from the lowest echelon staff that has regular student contact up through the Superintendent.

### U. *Health Standards*

The agency shall provide medical and dental care which meets the following criteria:

1. the health care program for each TYC delinquent facility is under the care of a licensed physician;

2. standard written operating procedures approved by the physician (or dentist as appropriate) exist for all medical and dental services including consent, screening, physical examinations, medical history, immunizations, pharmaceuticals, detoxification, first aid, and preventive, emergency, routine, chronic, convalescent and special care;

3. written job descriptions exist for all medical and dental personnel;

4. there are standing orders for treatment by personnel other than physicians and dentists;

5. there are written agreements with nearby hospitals for all medical services which cannot be provided within the facility;

6. state licensure and/or certification requirements apply to health care personnel;

7. the special medical needs of female students are provided for;

8. sick call is provided five days per week by a physician or registered nurse at the Reception Center and training schools. If in exceptional circumstances no physician or registered nurse is available, sick call may be conducted by a licensed vocational nurse who has immediate access to a physician;

9. there is provision for twenty-four (24) hour emergency care;

10. detoxification is provided only under close supervision of medical staff;

11. there is no medical experimentation or research;

12. stimulants, tranquilizers, and psychotropic drugs are never administered for punishment or for program management or control;

13. the physician-patient privilege and the principles of informed consent are honored; nothing herein shall, however, be construed to prohibit any TYC official from access to a student's medical records and information under appropriate circumstances;

14. there is provision for on-going review and evaluation of the health care programs by medical professionals outside the facility; and

15. the Agency makes reasonable effort to correct health problems identified at intake or during the student's stay in TYC delinquent facilities.

## V. TYC Program Goals

The primary goal of the TYC's programs shall be to assure that the students receive needed services in a safe, humane, caring environment to enable them to achieve normal growth and development, consistent with the necessary limitations imposed by the student's placement. The goals of the services which are to be provided to each student include the following:

1. to enhance individuality and self-respect;
2. to allow the enjoyment of privacy;
3. to develop intellectual and vocational ability;
4. to retain family and other personal ties;
5. to be enabled to express cultural identities;
6. to learn to relate and socialize with peers of both sexes;
7. to practice religious beliefs of their preference;
8. to be encouraged to explore political, social and philosophical ideas;
9. to enjoy an adequate, nutritious and varied diet;
10. to receive necessary medical and dental care;
11. to receive necessary psychological and psychiatric services;
12. to receive educational services appropriate to their needs;
13. to participate in a range of recreational activities;
14. to be safe from physical and psychological harm;
15. to communicate with persons in the community;
16. to exercise reasonable freedom of choice with respect to such personal matters as hair length and selection of friends;
17. to live in as near a home-like environment as possible which is conducive to personal security, privacy and dignity.

## W. Maintenance of Effort

The TYC shall accomplish the goals set forth herein in accordance with its rules and policies in effect upon the effective date of this Agreement and as they may be amended hereafter, except as certain practices or procedures may be specifically mandated herein. No right or privilege of any student committed to the TYC will be diminished by any adoption, amendment or repeal of any official rule without first complying with the provisions of the Texas Administrative Procedures and Texas Register Act.

## X. Intake

The intake process (wherever performed) shall include a personal, oral orientation session conducted in the student's language. The student shall be informed of the rules, the daily living program, his or her basic rights, the grievance procedure, and of what to expect in the assessment process. The intake process shall also include a physical, educational, and psychological assessment; the development of an individual program plan; and a placement decision.

## Y. Physical Assessment

Each student shall receive a physical assessment which shall include:

1. medical history;
2. current health problems;
3. vital signs;
4. VD test;
5. complete blood test;
6. immunizations;
7. urinalysis;
8. check for pediculi;
9. UCG;
10. vision and hearing;
11. TB test;
12. physical examination;
13. dental assessment.

## Z. Educational and Psychological Assessment

Each student at intake shall receive tests of personality, intelligence, scholastic

achievement, learning disabilities, and vocational and career education needs and interests. Each student shall be assessed for his or her abilities to function in a social environment, such assessment to include behavioral and clinical observation and educational and developmental history with information from persons familiar with the student's background. Additional special assessment shall be provided if feasible for students who have been identified as having drug-related problems, suicidal tendencies, retardation or other developmental disabilities, brain damage, psychiatric problems, and for non-English speaking and limited English speaking students. The results of the assessments, including the student's educational and other program needs, shall be documented and maintained in student's records.

## AA. *Individual Program Plan*

Each student shall have an individual program plan (IPP). The IPP shall include at least three elements: academic education, career development, and behavior. The IPP shall be developed no later than thirty (30) days after a student's admission to TYC. It shall include individual goals within each element. The plan itself, and the student's progress toward each goal, shall be reviewed at least every ninety (90) days. Development and review of the IPP shall be the responsibility of the student's caseworker. No IPP shall be developed, reviewed, or modified without meaningful participation by the student.

## BB. *Employee Screening*

All applicants for jobs whose major responsibility is the supervision of students shall be tested and evaluated by a psychologist prior to employment. The Agency shall not hire for such positions anyone whose test and evaluation results indicate he or she is psychologically unfit to work with children.

## CC. *Pre-Service Training*

No employee shall have sole supervisory responsibility for students until he or she has first received at least forty hours of pre-service training.

## DD. *Psychotropic Drugs*

Psychotropic drugs shall continue to be administered to students only for a diagnosed medical purpose. Psychotropic drugs shall be prescribed only by a medical doctor, who shall explain to the student the purpose and side effects of the medication. Staff who are in contact with students receiving psychotropic drugs will continue to be trained to recognize side-effects, indications, and contraindications in students who are taking psychotropic medications. The staff person or persons administering the drug shall continue to be specifically trained as to its administration in each student's case. The Agency shall continue to record the prescription and administration of psychotropic medication. The records shall be reviewed regularly by the Central Office and by a medical consultant who is not the prescribing physician.

## EE. *Program and Outcome Evaluation*

The Agency shall endeavor to develop and implement an evaluation system to measure program processes and outcomes of each TYC program and facility. These systems shall include two components:

a. Program Evaluation. Program evaluation determines whether TYC's programs are being implemented in accordance with the Agency's stated purposes and methods. Measurement criteria might include, for instance, the level of humaneness and fairness of the program's day to day operations, the perceptions of students and staff as to program effectiveness, measures of cost and efficiency, the incidence of problems such as runaways, assaults, discipline, reclassifications, transfers from community to institutions, etc., and the value of programs to students.

b. Outcome Evaluation. Outcome evaluation measures the programs' effectiveness in terms of producing change in the direction of stated goals. Outcome evaluation should also endeavor to locate and measure unanticipated consequences of par-

ticular activities. The measurement criteria might include, for example, recidivism, school achievement, employment performance, and cost. If possible, the data should cover a period from two years before placement at TYC until two years after release.

### FF. *Living Arrangements*

Living arrangements in TYC facilities, other than wilderness and camping programs, shall be designed to enhance and provide for the privacy and personal security of students. No student shall be segregated on the basis of race, color, national origin, or suspected homosexuality.

### GG. *Notice to Class*

The handbooks provided to each student shall contain the following notice in substantially the following language: "On March 3, 1983, a Settlement Agreement was entered in the federal court action titled *Morales v. Turman,* United States District Court, Eastern District of Texas, Civil No. 1948. That Settlement Agreement sets forth certain rights of students who are in the custody of the Texas Youth Council. A copy of that Settlement Agreement is available in the office of the Superintendent of each TYC facility and in the office of the Executive Director of the Texas Youth Council."

### VI. *Enforcement*

A. In the event that a dispute arises regarding the enforcement or interpretation of this Agreement which cannot be resolved amicably, *the parties* agree that this Agreement may be enforced by *any party* hereto in any court of competent jurisdiction. The parties agree that a procedure by which this Settlement Agreement may be enforced is by an action in contract. For purposes of initiating or participating in any action seeking enforcement or interpretation of this Settlement Agreement, the Committee of Consultants described in this Agreement is authorized to proceed as a third party beneficiary hereof.

B. In the event that the parties engage in litigation in the future regarding enforcement or interpretation of this Settlement Agreement, the parties further agree that the prevailing party in such litigation shall be awarded a reasonable amount as attorneys' fees, which award shall be determined by the court in which such litigation is pending according to the following guidelines: the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal services properly; the preclusion of other employment by the attorney due to acceptance of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation and ability of the attorneys; the "undesirability" of the case; the nature and length of the professional relationship with the client; and awards in similar cases; provided, however, that the Agency shall not be entitled to fees unless the opposing party's position is wholly frivolous or advanced in bad faith. The Committee of Consultants shall be treated as a party, for purposes of this attorney's fee provision, in the event that it participates in such litigation.

### VII. *Attorneys' Fees*

By Stipulation dated March 3, 1983, the defendants have agreed to pay to plaintiffs' counsel the sum of Two Hundred Ninety-Five Thousand Dollars ($295,000.00) in full satisfaction of their outstanding claims for fees and costs herein and have further requested the Court to enter its Judgment in accordance with the Stipulation.

### VIII. *Entire Agreement*

This Settlement Agreement resolves all of the outstanding issues before the Court and contains the entire agreement between the parties. No party has made any additional promises to induce the other party to enter into this Settlement Agreement.

### IX. *Request for Court Approval and Dismissal*

The parties request the Court to approve this Agreement in accordance with Rule 23,

Federal Rules of Civil Procedure, and that thereupon, upon the occurrence of the event set forth in the parties' Stipulation Regarding Entry of Final Judgment, this Court issue its order dismissing this lawsuit with prejudice.

NOW THEREFORE, in mutual consideration of all of the foregoing terms and conditions, the parties enter into this Settlement Agreement.

DATED this the 16th day of May, 1983.

FOR PLAINTIFFS:            FOR DEFENDANTS:

/s/ Peter B. Sandmann      /s/ Jim Mattox

PETER B. SANDMANN          HON. JIM MATTOX
Turner & Sandmann          Attorney General of Texas
354 Pine Street            P. O. Box 12548
San Francisco, California 94104   Capitol Station
(415) 391–8100             Austin, Texas 78701–2548
                           (512) 475–2501

PETER BULL
National Center for Youth Law
1663 Mission Street, 5th Floor
San Francisco, California 94103
(415) 543–3307

## MORALES CONSULTANT COMMITTEE JOINT VENTURE AGREEMENT

The Parties agree to form a joint venture on the terms and conditions set forth in this Agreement.

### ART. 1—GENERAL

1.1 *Parties.* The Parties (hereafter called "Committee Members") are Allen F. Breed, Frank Garfunkel, and Milton F. Shore. Nothing in this Agreement is intended, nor shall this Agreement be construed, to include the Executive Director of the Texas Youth Commission as a party to the joint venture established herein.

1.2 *Effective Date.* The effective date of this Agreement shall be _____, 1983.

1.3 *Name.* The joint venture name is Morales Consultant Committee.

1.4 *Purpose.* The purpose of the joint venture is to exercise the rights and perform the duties of the Committee of Consultants as set out in Part IV of the Amended Settlement Agreement in the case styled *Alicia Morales et al. v. James Turman et al.,* U.S.D.C., Eastern District of Texas, Sherman Div., C.A. No. 1948, dated May 16, 1983 (hereafter "Settlement Agreement"), which is hereby incorporated by reference.

1.5 *Place of Business.* The principal place of business shall be the Texas Youth Commission offices at 8900 Shoal Creek Blvd., Austin, Texas and/or such other places as the Committee Members may determine.

1.6 *Term.* The joint venture shall continue until August 31, 1987 unless extended in accordance with the terms of the Settlement Agreement.

### ART. 2—FUNDING, EXPENDITURES, AND UNEXPENDED BALANCES

2.1 *Funding.* The budget for the joint venture's operations shall be Sixty Thousand Dollars ($60,000.00) per year, which shall cover all costs incurred in connection with its activities, including but not limited to fees, expenses, overhead, administrative costs, travel, and consultants. Funding will be provided and costs charged in accordance with Part IV(R) of the Settlement Agreement.

2.2 *Expenditures.* All expenditures shall conform with the requirements of Texas state law. Committee Members shall receive a reasonable fee for services they render the joint venture and they shall be reimbursed for expenses they incur in carrying out joint venture purposes. In no event, however, shall the payment of any such fee, reimbursement, or other cost exceed the joint venture's budget as provided above.

2.3 *Unexpended Balances.* Any funds received by the joint venture which are not encumbered at the end of the joint venture's term, or at the end of any extension of its term as provided in Part IV(Q) of the Settlement Agreement, shall be forwarded by the joint venture to the Texas treasury within sixty (60) days from the end date.

## ART. 3—OTHER FINANCIAL AND ACCOUNTING MATTERS

3.1 *Method of Accounting.* The joint venture shall keep accounts on a cash basis. As to matters of accounting not provided for in this Agreement, generally accepted accounting principles shall govern.

3.2 *Books.* The joint venture books shall be kept at the principal place of business of the joint venture and every Committee Member shall at all times have access to and may inspect and copy any of them.

3.3 *Bank Accounts.* The joint venture shall maintain such bank accounts as the Committee Members shall determine. Checks shall be drawn for joint venture purposes only, and may be signed by any of the Committee Members. All monies received by the joint venture shall be deposited in such accounts.

## ART. 4—MANAGEMENT AND MEMBERS' INTEREST

4.1 *Management.* All Committee Members shall have equal rights in the management of the joint venture. Decisions shall be by majority vote, each Committee Member having one vote.

4.2 *Consultants.* The joint venture may employ consultants to assist it in carrying out joint venture purposes. Such consultants shall be subject to the approval of the Executive Director of the Texas Youth Commission in accordance with Part IV(J) of the Settlement Agreement.

4.3 *No Assignment of Interest.* No Committee Member may assign, pledge, or otherwise encumber his/her interest in the joint venture.

4.4 *No Addition To Joint Venture.* No person shall be admitted to the joint venture unless that person replaces a Committee Member pursuant to Paragraph 5.1 below.

## ART. 6—DEATH OR WITHDRAWAL OF COMMITTEE MEMBER

5.1 *Replacement of Committee Member.* A Committee Member who dies or withdraws shall be replaced promptly by majority vote of the remaining Committee Members, subject to approval of the new Committee Member by the Executive Director of the Texas Youth Commission in accordance with Part IV(M) of the Settlement Agreement.

5.2 *Withdrawal.* A Committee Member may withdraw from the joint venture upon thirty days prior written notice to the other Committee Members and to the Executive Director of the Texas Youth Commission.

## ART. 6—MISCELLANEOUS

6.1 *Liquidation.* Upon termination of this Agreement, assets remaining after all debts are paid shall be returned to the Treasury of the State of Texas.

6.2 *Notice.* Any notice required or permitted by this Agreement shall be in writing and shall be sufficient if sent by registered or certified mail to the last known address of the person to whom such notice is to be given. Any notice may be waived in writing by the person entitled to receive it.

6.3 *Construction of Agreement.* The captions used in this Agreement are for convenience only and shall not be construed in interpreting this Agreement. Whenever the context so requires, the masculine shall include the feminine and the singular shall include the plural, and conversely. If any portion of this Agreement shall be held invalid or inoperative, then, so far as is reasonable and possible, the remainder of this Agreement shall be considered valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative.

6.4 *Binding Effect.* This Agreement shall bind the Committee Members, their heirs, personal representatives, and assigns.

EXECUTED in multiple originals on the dates indicated:

| | |
|---|---|
| Allen F. Breed | Date |

| | |
|---|---|
| Frank Garfunkel | Date |

| | |
|---|---|
| Milton F. Shore | Date |

## EXHIBIT 2
## LINDA R. SINGER

918 Sixteenth Street, Northwest

Suite 503

Washington, D.C. 20006

(202) 296–2565

(202) 466–3030

### EDUCATION:

Radcliffe College, A.B., magna cum laude, 1963 (Phi Beta Kappa).

Woodrow Wilson Fellowship to Stanford University Graduate School of Arts and Sciences, 1964.

George Washington University Law School, J.D., with highest honors, 1968 (Law Review, Comment Editor; Trustees' Scholarship; Recipient of research grant from Walter E. Meyer Research Institute of Law; Order of the Coif; John Bell Larner Award for first scholar in class).

### LEGAL EXPERIENCE

Private practice of law, 1968 to present.

Partner, Goldfarb, Singer and Austern, Washington, D.C. 1971 to present.
  General practice with emphasis on public interest and civil rights cases.

Founder and Executive Director, Center for Community Justice (formerly Center for Correctional Justice), 1971 to present.
  Governmentally and privately supported organization, which has developed, implemented and evaluated alternative methods of resolving disputes in institutional and community settings.

Special Master, United States District Court for the Southern District of New York, 1980 to present.

### TEACHING:

Faculty, Salzburg Seminar in American Studies, Session on Conflict Resolution, Summer 1981.

Visiting Lecturer, Stanford and UCLA Law Schools, Winter and Spring 1975 (conflict resolution; juvenile and adult corrections).

### SELECTED ASSOCIATIONS:

District of Columbia Judicial Nomination Commission (elected to six-year term by Board of Governors of the District of Columbia Bar, 1981).

Special Committee on Alternative Means of Dispute Resolution, American Bar Association.

Board of Directors and National Labor Panel, American Arbitration Association.

District of Columbia Judicial Conference, Committee on Legal Services.

District of Columbia Superior Court, Committee on Voluntary Arbitration.

Former Chair, Personal Rights Litigation Committee, Litigation Section, American Bar Association.

Former Member, Advisory Committee on Procedures, United States Court of Appeals for the District of Columbia.

Board of Governors, District of Columbia Bar, 1978–81.

Chair, Lawyer Referral and Information Service, District of Columbia Bar, 1977–78.

Federation of Women Lawyers, Judicial Screening Panel, District of Columbia Circuit Representative, 1978–81.

### SELECTED CONSULTANTSHIPS:

American Bar Association—Institute for Judicial Administration, Juvenile Justice Standards Project, Reporter, Dispositions Volume.

Fellow, Research Institute on Legal Assistance of the Legal Services Corporation.

National Institute of Corrections, (grievance procedures in correctional institutions, mediation of prisoners' civil rights complaints in Maryland, moni-

toring of consent decree in juvenile institutions in Tennessee).

California Youth Authority.

Federal Trade Commission.

Legal Advisor to the Special Master, Federal District Court of Rhode Island.

Institute for Social Analysis, Neighborhood Justice Center Evaluation.

American Bar Association Commission on Correctional Facilities and Services.

Department of Health and Human Services.

State Bar of California—Committee on Law in the Future.

National Advisory Committee on Criminal Justice Standards and Goals, Task Force on Juvenile Justice.

Association of American Law Schools.

American Academy of Judicial Education.

National College of State Trial Judges.

The Ford Foundation.

Institute of Mediation and Conflict Resolution.

President's Task Force on Women Business Owners.

PUBLICATIONS:

"Mediation: A New Remedy for Cases of Domestic Violence," 7 *Vermont Law Review* 15 (1982), (co-author).

*Complaint Procedures in Prisons and Jails: An Examination of Recent Experience,* National Institute of Corrections, 1980 (co-author).

"The Growth of Non-Judicial Dispute Resolution: Speculation on the Effects of Justice for the Poor," *Clearinghouse Review,* December 1979, reprinted in *Proceedings of the Second National Conference on Legal Services and the Public* (American Bar Association, Consortium on Legal Services and the Public Legal Services Group).

"Conflict Resolution in High Schools: A Modest Proposal", *Nassp Bulletin,* February 1978, (co-author).

"Dispute Resolution in the Future: What are the Choices?" 51 *California State Bar Journal,* July 1976, (co-author).

"Dispositions," American Bar Association—Institute for Judicial Administration, Juvenile Justice Standards Project, 1977.

*Grievance Mechanisms in Correctional Institutions,* National Institute on Law Enforcement and Criminal Justice, United States Government Printing Office, 1975 (co-author).

"Grievance Mechanisms in American Corrections: The State of the Art," *Resolution,* Volume 1, May 1975, (co-author).

*Seen But Not Heard: A Survey of Grievance Mechanisms in Juvenile Correctional Institutions,* ABA–IJA Juvenile Justice Standards Project, 1974 (co-author).

"The Supreme Court and Prisons: A Return to 'Hands-Off'?" *Washington Post,* July 11, 1974.

*After Conviction: A Review of the American Correction System,* Simon and Schuster, 1973 (paperback edition, 1978), (co-author).

"Prison Violence, Prison Litigation: Is There a Better Way?" *Crime and Delinquency,* 367, July 1973, (co-author).

"The Courts and the Prisons: A Crisis of Confrontation," *The Criminal Law Bulletin,* May 1973, (co-author).

"Enforcing the Constitutional Rights of Prisoners," 17 *Howard Law Journal,* June 1973.

"Women and the Correctional Process," 11 *American Criminal Law Review* 295, Winter 1973.

"The Center for Correctional Justice: A Way to Resolve Prisoners' Grievances?" 51 *The Prison Journal* 37, Fall/Winter 1973, (co-author).

"Where Were All the Lawyers?" *Justice Magazine,* February 1972.

"Disaster Road: The American Prison System," *The Intellectual Digest,* December 1971, (co-author).

"Just Ask the Man Who's Been There," *Washington Post,* June 6, 1971 (co-author).

"The Need for a Way to Deal with Prison Grievances," *Washington Post,* September 25, 1971 (co-author).

"Redressing Prisoners' Grievances," 39 *George Washington Law Review* 175, 1970 (co-author).

Advisory Task Force Report to the White House Conference on Youth, Task Force on Legal Rights and Justice, 1971 (editor).

"Compensation of Crime Victims," *Washington Post,* December 18, 1970 (co-author).

"Problems in the Administration of Justice in California," California Legislature, Assembly Judiciary Committee, 1969 (co-author).

"Maryland's Defective Delinquency Law and the Patuxent Institution," 34 *Bulletin of the Menninger Clinic* 223, 1970 (co-author).

"Pretrial Detention," published as a chapter of the Report of the Law Enforcement Task Force to the President's Commission on the Causes and Prevention of Violence, 1969.

"The Inadequacy of Legal Procedures Available for Resolution of Grievances of the Poor," prepared for the Law Enforcement Task Force of the President's Commission on the Causes and Prevention of Violence, October 1968.

Comment, "Title VI of the Civil Rights Act of 1964—Implementation and Impact," 36 *George Washington Law Review* 824, 1968 (editor).

Comment, "Federal Injunctions Against State Actions," 35 *George Washington Law Review* 751, 1967.

Note, "Federal Jurisdiction," 35 *George Washington Law Review* 121, 1966.